Joaquin Marcelo Veron RAMOS and
Maria Milagros Ramos, Petitioners,

v.

IMMIGRATION & NATURALIZATION
SERVICE, Respondent.

No. 81–4479
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1983.

Eugenio Cazorla, Dallas, Tex., for petitioners.

Stephen M. Weglian, Jr., Lauri Steven Filppu, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for respondent.

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is a petition for review of an order of the Board of Immigration Appeals ("the Board") denying petitioners' application for suspension of deportation under section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1). The primary questions are whether the Board failed to consider the noneconomic hardship that petitioners' deportation might have on their family, especially on their two United States citizen children, and if so, whether the Board thereby failed to properly exercise its discretion. We hold that the Board's decision fails to reflect consideration of all the relevant hardship factors asserted by petitioners in reaching its decision regarding the existence of "extreme hardship." Accordingly, we remand the case to the Board for further proceedings so that the "extreme hardship" determination may be made upon a proper consideration of all the asserted hardship factors.

I.

Petitioners Joaquin and Maria Ramos are natives and citizens of the Philippines. On July 20, 1967, petitioners entered the United States at Savannah, Georgia, as nonimmigrant visitors for pleasure with permission to stay until October 20, 1967. They subsequently obtained permission to stay until April 20, 1968.

In February 1968, Mr. Ramos was hired by his present employer, the 3M National Advertising Company, to work in Chicago, Illinois. Mrs. Ramos obtained employment at a Chicago hospital as a medical technologist. While in Chicago, Mrs. Ramos gave birth to two children, Michael, who was born in May 1968, and Mark, who was born in December 1970. Because they were born in this country, both children are United States Citizens.

Petitioners lived and worked in Chicago with their two children until 1974, when 3M transferred Mr. Ramos to Dallas, Texas. Mrs. Ramos obtained employment in Dallas, again as a medical technologist. Petitioners and their children have lived in Dallas since that time. Mr. Ramos's parents, who are aliens lawfully admitted for permanent residence and partially dependent on petitioners for support, also lived with them in Dallas for a while.[1]

Because petitioners failed to leave the United States within the time authorized for their departure,[2] deportation proceed-

---

1. Mr. Ramos's mother and father now live in Chicago, Illinois.

2. Efforts were made on petitioners' behalf to obtain third preference visas for them and to obtain relief through a private bill in Congress. In January 1968, Mr. Ramos filed a petition for a third preference visa. Early in 1970, he discovered that the INS had lost this application, and in March 1970, he refiled it. In June 1971, the third preference visa was approved; however, it was revoked in May 1972, and administrative appeal was denied in July 1972. In August 1972, efforts were begun to have a private bill introduced in Congress on behalf of both the Ramoses, and such a bill was filed by Congressman Rostenkowski in February 1973. Mrs. Ramos applied for a third preference visa in September 1972, and it was granted in July 1973. However, all these efforts ultimately proved unavailing, and petitioners were or-

ings were instituted against them. Petitioners conceded deportability, and applied for discretionary relief under 8 U.S.C. § 1254(a)(1).[3] Petitioners asserted that if they were deported extreme hardship would result to themselves, to their United States citizen children, and to Mr. Ramos's resident alien parents.

Following several hearings which concluded on January 26, 1977, an immigration judge, in a written decision dated November 21, 1977, rejected petitioners' claims of hardship and denied their application for suspension of deportation. Petitioners appealed to the Board, which, on March 19, 1980, remanded the case to the immigration judge, holding that:

> "In view of the amount of time that has passed since the last hearing on [petitioners'] application, and the representations made on appeal concerning extreme

hardship to the [petitioners'] two United States citizen children, we have concluded that the record must be remanded so that it may be updated."

On remand, the immigration judge conducted a hearing on October 21, 1980, during which he received additional evidence. He then issued a written decision, dated April 8, 1981, which tracked almost word for word his initial decision denying suspension of deportation.[4] In his decision, the immigration judge recited petitioners' assertions respecting the acclimation of their children to the "American way of life" and the difficulty they would undergo as a result of a change of schools. And he referred to petitioners' attempt to obtain a continuance for psychiatric evaluation of the effect a return to the Philippines might have on their children.[5] But the judge's

---

dered to leave the United States; Mr. Ramos by February 1, 1973, and Mrs. Ramos by February 7, 1975.

**3.** 8 U.S.C. § 1254(a)(1) provides:

"Suspension of deportation—Adjustment of status for permanent residence; contents

"(a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien (other than an alien described in section 1251(a)(19) of this title) who applies to the Attorney General for suspension of deportation and—

"(1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, *in the opinion of the Attorney General,* result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." (Emphasis added.)

**4.** Although the immigration judge found that petitioners had not established that their deportation would result in extreme hardship to themselves or to their United States citizen children, the judge stated in both decisions that they were "statutorily eligible for suspension of deportation" but that "the factors that must be

weighed do not indicate that they merit the granting of suspension of deportation." Section 1254(a)(1) clearly provides that one is eligible for suspension of deportation only if all the requirements, including a showing of extreme hardship, are met. Since the immigration judge found that extreme hardship was not shown, his statement that petitioners were "statutorily eligible," is not comprehensible, and nor is his further statement that "the factors ... do not indicate that they merit the granting of suspension." On appeal, the Board did not mention or discuss these latter factors. The Board's decision denying suspension rested exclusively on the determination that petitioners had failed to show extreme hardship. Accordingly, we can affirm the Board only if it properly disposed of the "extreme hardship" matter. *See Reyes v. INS,* 673 F.2d 1087, 1091 (9th Cir.1982).

**5.** A psychiatric evaluation of petitioners' children was performed by Dr. Frank E. Crumley, a child and adolescent psychiatrist. His January 26, 1977 report states in part:

"[Michael's] history reveals difficulty adjusting to school after the family moved from Chicago to Dallas. He would not talk in school for several months. His father had to attend school with him since he showed school phobia symptoms.... His speech, choice of toys, knowledge, and interest were typical of American boys.

"...

"[Mark's] choice of toys and drawings were typical of American children.... He would be particularly vulnerable to a move at this age because he is just now developing relationships outside the home.

only response to or evaluation of these assertions was that "the children could stay with a sister of Mr. Ramos."[6] The immigration judge instead concentrated almost exclusively on the economic hardship that petitioners' deportation would have on themselves and on their children:

"The mere fact that an alien's economic opportunity in a foreign country may be somewhat less than they are in the United States, is not, by itself, sufficient to establish the 'extreme hardship' required...."

Petitioners again appealed to the Board, which, by decision dated November 17, 1981, affirmed the immigration judge's order. In its discussion respecting the "extreme hardship" issue, the Board, like the immigration judge, concentrated almost entirely on the assertions of economic hardship to petitioners and to their children, though the record plainly shows that petitioners did not rely primarily upon economic factors to establish extreme hardship.[7] In addition, neither the immigration judge nor the Board recited or discussed the asserted hardship on Mr. Ramos's parents.

"... Neither child has ever been separated from their parents. They have always been cared for by them. They have strong bonds toward their parents. It would be extremely traumatic if they were now separated from their parents. This would be particularly traumatic since there would be little or no understandable explanation for this in their minds. Even if there were other relatives available, they could not substitute for their own parents and the children would be emotionally orphaned.

"...

"Once a child has adopted the culture of a country he is subject to rejection by peers if he is forced to readjust to the new culture. The child at age six and onward is particularly vulnerable to this .... Mark would be in a particularly vulnerable age at this time .... He showed evidence of anxiety about his ability to make friends.

"Michael has already shown symptoms of school phobia and transient elective mutism, following a previous move even within the United States. He would be particularly vulnerable to exacerbation of these symptoms especially if he were forced to move outside of the country. He is very much identified with American culture. He is concerned about his ability to make friends and shows evidence of impending depression if he could

## II.

To be eligible for discretionary suspension of deportation under 8 U.S.C. § 1254(a)(1), an alien must show: (1) that he has been physically present in the United States for a continuous period of time not less than seven years immediately preceding an application for relief; (2) that during this period, he was and is a person of good moral character; and (3) that "in the opinion of the Attorney General," his deportation would result in "extreme hardship" to himself or to his spouse, parent, or child who is a citizen of the United States or a lawful permanent resident. An alien who meets these requirements is merely eligible for suspension of deportation, and is in no way entitled to such relief. *Faddah v. INS,* 580 F.2d 132, 133 (5th Cir.1978). Thus, even where all the requirements are met, suspension of deportation may be denied in the exercise of discretion. *Vaughn v. INS,* 643 F.2d 35, 37 (1st Cir.1981). The decision whether to suspend the deportation of an alien who satisfies the three statutory requirements is therefore discretionary, and is

not make appropriate friends. He is already described as a shy child .... [H]e would be prone to withdraw and isolate himself in depression.

"... If the family were opposed to moving, this would be extremely traumatic for the family and precipitate a crisis ....

"... [A] forced family move would create an extreme hardship on the children at this point in their life."

This report was not available at the January 1977 hearing before the immigration judge. It was attached to petitioners' brief to the Board on the first appeal. On remand, this matter was brought to the attention of the immigration judge. Dr. Crumley did not testify nor was his report updated at the hearing on October 21, 1980.

6. Mr. Ramos has three sisters who live in the United States. Two are citizens and the other is a resident alien.

7. In its brief in this Court, the INS also recognized this:

"As the deportation proceeding unfolded, it became apparent that the Ramos' claim of 'extreme hardship' focused almost exclusively on the impact of deportation on their two sons."

subject only to a most restricted judicial review. *Foti v. INS,* 375 U.S. 217, 228, 84 S.Ct. 306, 313, 11 L.Ed.2d 281 (1963).

As to an alien's eligibility for discretionary relief, the determination whether he has satisfied the first and second statutory requirements are "findings of fact," and must "be supported by reasonable, substantial, and probative evidence on the record as a whole." 8 U.S.C. § 1105a(a)(4).[8] However, unlike the first two requirements, the third statutory requirement, that of extreme hardship, is phrased in terms of "in the opinion of the Attorney General," rather than simply in terms of the ultimate standard (extreme hardship) itself.

In *INS v. Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981), the Supreme Court observed with respect to the words "extreme hardship" that "the Act commits this definition in the first instance to the Attorney General and his delegates," *id.* at 144, 101 S.Ct. at 1031, and they "have the authority to construe 'extreme hardship' narrowly should they deem it wise to do so." *Id.* at 145, 101 S.Ct. at 1031. We believe that the Supreme Court's decision in *Wang* is inconsistent with those earlier Courts of Appeals decisions, such as *Bastidas v. INS,* 609 F.2d 101, 104 (3d Cir.1979), which held that determinations of no "extreme hardship" were reviewable under the conventional "substantial evidence" test of section 1105a(a)(4) to essentially the same extent as determinations of the seven continuous years of physical presence and good moral character requirements of section 1254(a)(1). Other pre-*Wang* Courts of Appeals decisions had indicated that review of no "extreme hardship" determinations was under a more limited "abuse of discretion" standard. *See Brathwaite v. INS,* 633 F.2d 657, 659–60 (2d Cir.1980) (recognizing differing standards, but not choosing between them).

Our own pre-*Wang* decisions, while not expressly referring to differing standards of review for "extreme hardship" determinations as contrasted to the other two requirements of eligibility for discretionary relief under section 1254(a)(1), appear to have followed an abuse of discretion approach. *See Chokloikaew v. INS,* 601 F.2d 216, 218 (5th Cir.1979).[9] In view of *Wang*'s language concerning the authority of the Attorney General to define "extreme hardship" and to construe it narrowly, we doubt that there remains much, if any, scope for judicial *substantive* review, even under an "abuse of discretion" standard, of no "extreme hardship" determinations.

We do not believe, however, that *Wang* foreclosed all review in this area. *Wang* does not question *Foti,* which clearly held that in a deportation proceeding denial of requested suspension of deportation under section 1254(a)(1) was judicially reviewable pursuant to section 1105a(a). At the very least, then, it would appear that judicial review remains available to ensure that an alien, denied relief under section 1254(a)(1) by reason of a no "extreme hardship" determination, has had a fair and full considera-

---

**8.** 8 U.S.C. § 1105a(a)(4) provides:

"Judicial review of orders of deportation and exclusion—Exclusiveness of procedure

"(a) The procedure prescribed by, and all the provisions of sections 1031 to 1042 of Title 5, shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 1252(b) of this title or comparable provisions of any prior Act, except that—

"...

"Determination upon administrative record

"(4) except as provided in clause (B) of paragraph (5) of this subsection, the petition shall be determined solely upon the adminis-

trative record upon which the deportation order is based and the Attorney General's *findings of fact,* if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive." (Emphasis added.)

**9.** In *Chokloikaew,* we reviewed a no "extreme hardship" determination under the following standard:

" '[T]he inquiry goes to the question whether or not there has been an exercise of administrative discretion and, if so, whether or not the manner of exercise has been arbitrary or capricious.' *Paul v. Immigration and Naturalization Service,* 5 Cir., 1975, 521 F.2d 194, 197." *Id.* at 218.

tion of his claims in this regard.[10] This seems to be the trend of the post-*Wang* decisions of other Courts of Appeals, and we are in general agreement with this view. *See, e.g., Prapavat v. INS,* 638 F.2d 87 (9th Cir.1981), *aff'd on rehearing,* 662 F.2d 561, 562 (9th Cir.1982) (remanded to Board because it "did not consider all the factors relevant to the 'extreme hardship' determination"); *Santana-Figueroa v. INS,* 644 F.2d 1354, 1356–57 (9th Cir.1981) (same); *Ravancho v. INS,* 658 F.2d 169, 174–76 (3d Cir.1981) (same); *Phinpathya v. INS,* 673 F.2d 1013, 1016–17 (9th Cir.) (same; Mr. Phinpathya's case), *cert. granted,* —— U.S. ——, 103 S.Ct. 291, 74 L.Ed.2d 275 (1982) ("question presented" relates to issue of "continuous physical presence" in Mrs. Phinpathya's case). *Cf. Bueno-Carrillo v. Landon,* 682 F.2d 143 (7th Cir.1982).[11]

The factors generally relevant to a determination of extreme hardship are summarized as follows in *Bueno-Carrillo:*

"We do not believe that Congress intended the immigration courts to suspend the deportation of all those who will be unable to maintain the standard of living at home which they have managed to achieve in this country.... It is only when other factors such as advanced age, illness, *family ties,* etc. combine with economic detriment that deportation becomes an extreme hardship." *Id.* at 146 (emphasis added).

The relevance of close family ties seems implicit in the statutory provision that the "extreme hardship" requirement may be met by showing such hardship to the citizen or legal resident spouse, parent, or child of the alien, even though no such hardship would result directly to the alien himself.[12] And there is ample authority in other Circuits for the proposition that imposing on grade school age citizen children, who have lived their entire lives in the United States, the alternatives of either prolonged and geographically extensive separation from both parents or removal to a country of a vastly different culture where they do not speak the language, is a matter which normally must be considered by the INS in its determination of whether "extreme hardship" has been shown. *Ravancho* [13]; *Prapavat* [14]; *Phinpathya.* [15] This Circuit has not expressly so held, but we believe our prior decisions are not inconsistent with this ap-

---

**10.** We are not concerned here with the special factors warranting particularly limited consideration in "reopening" cases, which are discussed in *Wang* 450 U.S. at 142–44, 101 S.Ct. at 1030, 1031.

**11.** In *Bueno-Carrillo,* the Seventh Circuit affirmed a no "extreme hardship" determination, noting that:

"... the record reveals that both the immigration judge and the Board of Immigration Appeals considered all of the relevant evidence before them, applied the correct standards of law, and concluded that the requisite 'extreme hardship' had not been shown. Relevant evidence was neither distorted nor disregarded." *Id.* at 145–46.

**12.** We also observe that relevant specific hardship factors, though not "extreme" in themselves, are to be considered in the aggregate, rather than in isolation, in determining whether "extreme hardship" exists. *Bueno-Carrillo* at 146 n. 3; *Santana-Figueroa* at 1357.

**13.** Eight year old who "knows no other life than that in the United States, is unable to speak the Philippine language" and whose "'life would be dramatically upset by being uprooted from her home, friends, and the only life she knows'." *Ravancho* at 171. Case re-

manded to the Board to specifically consider psychiatric evaluation report concerning the effect on the child of removal to the Philippines in light of other relevant hardship evidence.

**14.** Five-year-old daughter "born in this country, has spent her entire life here. She is enrolled in school, a factor of significance .... [Citing cases.] If her parents are deported, this American citizen child will be uprooted from her native country where she has spent her entire life, and taken to a land whose language and culture are foreign to her." *Prapavat,* 638 F.2d at 89. Case remanded to the Board to more specifically address this aspect of hardship. *Prapavat,* 662 F.2d at 562–63.

**15.** Although the Board sustained on its finding that proof did not show medical care in Thailand would be inadequate for the young American citizen daughter, the case was remanded to the Board to expressly address "whether the mere removal, and uprooting, of an epileptic child, wholly apart from the question of comparative medical care, constitutes extreme hardship. The effects on an epileptic child of a long trip and of being placed in a wholly different environment are factors that, at the least, bear on a hardship determination and should have been considered by the BIA. None of the

proach. In *Chokloikaew,* we held that a determination of no "extreme hardship" was not an abuse of discretion, noting with respect to the alien's various assertions of hardship, that the immigration judge "considered each of those factors." *Id.* at 218. We went on to point out that "[e]conomic detriment ... does not compel a finding of 'extreme hardship'," *id.* at 218, and that:

"He [the alien] lived in Thailand, where his family lives now, until he was twenty-

one years old and should not suffer 'extreme hardship' in readjusting to social and economic conditions there. *Compare Acosta v. Landon,* S.D.Cal., 1954, 125 F.Supp. 434 (suspension of deportation granted to alien who had been in this country legally for almost forty years, had married a native-born United States citizen, and had four American-born children)." *Id.* at 218.[16]

reasons asserted by the BIA reflects consideration of those factors ...." *Phinpathya,* 673 F.2d at 1016.

16. In *Perdido v. INS,* 420 F.2d 1179 (5th Cir. 1969), our major holding was that deportation of the parents of a citizen child does not violate the child's constitutional rights. We also held that for purposes of waiver under 8 U.S.C. § 1182(e) of the requirement that certain aliens admitted as students spend two years outside the United States before being eligible for return on a permanent basis, the fact that the aliens' one- and two-year-old citizen children would as a practical matter have to spend two years in the Philippines, was not an "exceptional hardship" of "the sort intended by Congress to call for the exercise of the waiver provision" of section 1182(e). *Id.* at 1181. There is, of course, a great difference between the adjustment required of such infants and that of grade school age children. *Aalund v. Marshall,* 461 F.2d 710 (5th Cir.1972), was concerned with deportation and denial of the discretionary relief of voluntary departure under 8 U.S.C. § 1254(e), which has an eligibility requirement of "good moral character," but *not* of "extreme hardship." We held that the fact that the alien's deportation "would necessarily entail a de facto deportation of her infant child," a United States citizen, did not render the alien's "underlying deportation order" void or arbitrary or capricious, nor render the alien, who had been properly found *not* of good moral character, eligible to be considered for voluntary departure. For these reasons, failure of the immigration judge to consider the effect of his order on the infant citizen child was immaterial, since "had he done so, no different result *could* have obtained." *Id.* at 714 (emphasis added).

In *Gonzalez-Cuevas v. INS,* 515 F.2d 1222 (5th Cir.1975), the aliens' entry from Mexico had been on 72-hour visas. In their deportation they requested, and were allowed, voluntary departure with deferral until the end of the school year to accommodate their children, two of whom (of a total of nine) were United States citizens. On appeal to this Court, they sought remand, as well as review of denial of requested reopening, to develop evidence supporting a

further deferral until they could mature a priority position for an immigration visa. We again held that lawful deportation of parents of citizen children did not violate the *rights* of the children, and that the presence of citizen children did not confer on the illegal alien parents the legal *right* to further deferral of voluntary departure until their visas could be obtained. *Gonzalez-Cuevas* did not involve section 1254(a)(1) or other statute *expressly* dealing with "extreme hardship," or the equivalent, *to* citizen children of a deportable alien.

*Faddah v. INS,* 553 F.2d 491 (5th Cir.1977), sustained denial of petition to reopen deportation proceedings to seek discretionary relief under section 1254(a)(1). Of the alien couple's four children, two were United States citizens (one born after the decision of the Board, the age of the other being undisclosed). We noted that other than the children, the aliens had no immediate family in the United States, and did have some family in their native Finland. The children "had English as their first language" (presumably Finnish as their second). We held that extreme hardship was not established, and also that the aliens were not of good moral character and that their dilatory tactics made their required seven years' residence in doubt. Because of its rather unique facts, as well as it having been a reopening case (*see* note 10, *supra*), we do not consider *Faddah* as being inconsistent with our analysis here. *Aguilar v. INS,* 638 F.2d 717 (5th Cir.1981), likewise involved an appeal from a refusal to reopen. We held the Board did not abuse its discretion in determining that an adequate prima facie case of extreme hardship was not made by aliens from Belize, one of whom had a four-year-old citizen child. We observed that the Board had expressly held there was no evidence the citizen child would suffer specific hardship if returned to Belize, and that all immediate relatives of the aliens lived in Belize, except the child's father, a United States citizen who was separated from the alien mother. The opinion does not indicate whether there was any showing the child was unable to speak Spanish. In *Men Keng Chang v. Jiugni,* 669 F.2d 275 (5th Cir.1982), we again sustained a refusal to re-

The discretionary determination respecting extreme hardship is not bound by any fixed rules; rather it depends upon the facts and circumstances of the particular case. Because this is so, the Attorney General can properly fulfill his duty to exercise his discretion only if he or his delegates actually consider those facts and circumstances. *Santana-Figueroa* at 1356 [17]; *Phinpathya* at 1016. The Board's decision must reflect that it has meaningfully addressed and reached a reasoned conclusion on the alien's specific assertions of hardship that are based on evidence. The Board has a duty "to 'give reasons which show that it has properly considered the facts which bear on its decision.' *Mejia-Carrillo v. INS*, 656 F.2d 520, 522 (9th Cir.1981)." *Prapavat*, 662 F.2d at 562. The reasons given by the Board for denial of relief must "reflect[ ] consideration of" the relevant evidence of claimed hardship. *Phinpathya* at 1016. As the reviewing Court, we must "make our decision," concerning the factors considered by the Board, "based on the Board's own articulation of its actions," rather than on assumptions. *Ravancho* at 175. As stated in *Santana-Figueroa:*

"... [W]hen allegations are specific and supported by evidentiary material, and the Board denies eligibility for relief, it must give reasons for its decisions showing that it has properly considered the circumstances.... To affirm on the theory that the Board necessarily considered whatever the petitioner asserted would free the Board of the obligation to articulate a reasoned basis for its decisions, eliminating any guaranty of rationality ...." *Id.* at 1357.

*See also* 8 C.F.R. §§ 103.3, 242.18(a) (1982); *Perez v. INS*, 643 F.2d 640, 641 (9th Cir.), *modified*, 665 F.2d 269 (9th Cir.1981), *peti-*

tion for cert. filed, —— U.S. ——, 103 S.Ct. 320, 74 L.Ed.2d 296 (1982) ("question presented" relates to whether Court of Appeals erred in holding verification requirements for motions to reopen deportation proceedings could be disregarded in light of *Wang*).

## III.

It is undisputed that petitioners satisfied the first and second requirements of section 1254(a)(1). The immigration judge and the Board, however, held that petitioners failed to show extreme hardship, and thus, they were statutorily ineligible for discretionary relief.[18]

At the initial hearing before the immigration judge on January 26, 1977, petitioners introduced evidence that their children, who were then eight and six years old, are in all respects culturally American; that they both speak English; that they do not speak the language of the Philippines, which is Tagalog (an Austronesian language); and that they have no emotional ties to the Philippines. Petitioners also testified that when they moved to Dallas from Chicago, their oldest son, Michael, had been emotionally traumatized by the relocation, and that a move to the Philippines would cause a more serious trauma because of the different culture.[19] In this same connection, petitioners testified to their concern about the effect the different culture of the Philippines would have on both children. Petitioners also testified to the hardship that their deportation would have on Mr. Ramos's parents.

It is evident from the written decisions of the immigration judge that he did not consider the emotional and other noneconomic hardships that petitioners asserted would result to their children and to Mr. Ramos's

open requested on the basis of claimed hardship to two citizen children, noting that these children were barely two years old and were then, and had been for most of their brief lives, residents of Taiwan. These holdings are not contrary to our present analysis.

17. "Because hardship depends on specific circumstances, *Banks v. INS*, 594 F.2d 760, 762 (9th Cir.1979), discretion can be properly exer-

cised only if the circumstances are actually considered. When important aspects of the individual claim are distorted or disregarded, denial of relief is arbitrary." *Santana-Figueroa* at 1356 (footnote omitted).

18. *See* note 4, *supra.*

19. *See* note 5, *supra.*

parents should they be deported, even though the Board, on the first appeal, had remanded the case to the immigration judge to update the record, partly in response to petitioners' assertions of hardship to their children.

In its opinion on the second appeal, the Board recited petitioners' contentions that "they [*i.e.,* petitioners] would go through agony if separated from their United States citizen children," and that "the favorable factors in their cases, when combined with the economic detriment that they would allegedly suffer if deported, establish extreme hardship." The Board also recognized that extreme hardship "depends upon the facts and circumstances of each particular case"; that "[i]n determining whether such hardships exist one must consider all the factors involved in a case"[20]; and that "what circumstances constitute 'extreme hardship' require a delicate balancing and are rarely made by the Board on the basis of a single factor alone." The Board, however, proceeded to discuss only the economic detriment that would be caused by the petitioners' deportation:

"In concluding that extreme hardship has not been established in the instant case, we acknowledge that the [petitioners] may encounter some difficulty in obtaining similar employment for similar pay in the Philippines. *See Guadarrama-Rogel v. INS,* 638 F.2d 1228 (9th Cir. 1981). Any economic detriment caused by their deportation, however, *in and of itself* is insufficient to support the statutory requirement of 'extreme hardship.' *See Blanco-Dominguez v. INS,* 528 F.2d 382 (9th Cir.1975); *Pelaez v. INS,* 513 F.2d 303 (5th Cir.1975), *cert. denied,* 423 U.S. 892, 96 S.Ct. 190, 46 L.Ed.2d 124 (1975). The [petitioners] are still comparatively young and have accumulated considerable financial assets in this country. We do not find the possibility of their

being unable to find jobs that pay as well as the ones in the United States to be so severe as to result in 'extreme hardship' if they are deported to the Philippines. In any event, they should benefit from the experience and maturity gained in the United States." (Emphasis added except in citations.)

The Board did not in any way address the asserted *noneconomic* hardship to petitioners themselves or to their children, and it also totally ignored the asserted hardship to Mr. Ramos's parents, even though these assertions were based on evidence. And, the Board accordingly also failed to consider *cumulatively* the hardship factors pertaining to each member of the statutory class. These failures amounted to a denial of the consideration which Mr. and Mrs. Ramos were entitled to have the Board give to their claims.

While we emphasize that we "do not question the Board's finding on the basis of our own view of what constitutes extreme hardship," we do hold that in making a determination of what constitutes extreme hardship, the decision of the immigration authorities must affirmatively reflect that they have meaningfully addressed and reached a reasoned conclusion concerning all the factors relevant to that determination which are based on evidence, a requirement that the Board itself abstractly recognized, but did not apply. *Prapavat* at 562.

We recognize that the immigration authorities are burdened by a heavy case load. It is not our intention to require of them lengthy exegeses on immigration law or extended discussion of evidentiary minutiae. All we insist upon is a sufficient indication that they have a fair understanding of what the alien's various relevant contentions of hardship, supported by the evidence, actually are; that they have meaningfully considered and evaluated each of

---

**20.** The Board listed the following factors which should be considered as including (1) the age and health of a subject, and of his family; (2) his family ties in the United States and abroad; (3) his length of residence in the United States; (4) the conditions, both economic and political, in the country to which the alien is returnable; (5) the financial status of the alien, including his business and occupation; (6) the possibility of other means of adjustment of status; and (7) his immigration history.

these contentions; and that they provide a statement of the reasons why, in their opinion, these contentions do not, individually and in the aggregate, establish "extreme hardship."

We reverse the Board's order as to both petitioners and remand the case to it for further proceedings consistent with this opinion.[21]

REVERSED AND REMANDED.

**21.** We, of course, express no opinion as to the weight to be accorded the hardship factors or as to the final result of petitioners' application for discretionary relief. Nor do we express an opinion as to whether the Board should remand the case to the immigration judge for a new hearing. This is a matter for the Board to decide.