**Raul Quan YOUNG and Grace Larrad de Quan, Petitioners,**

v.

**The UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 84–4506.**

United States Court of Appeals, Fifth Circuit.

May 2, 1985.

---

1. 28 U.S.C. § 2254.

Goldberg, Circuit Judge, filed dissenting opinion.

Loyola Law School Clinic, Evangeline G. Abriel, David Ware, New Orleans, La., for petitioners.

Wm. F. Smith, Atty. Gen., Dept. of Justice, Robert L. Bombough, Dir., Office of Immigration & Madelyn E. Johnson, Litigation, Civil Division, Allen W. Hausman, Washington, D.C., for respondent.

David H. Lambert, Dist. Dir., I.N.S., New Orleans, La., for other interested parties.

Before GOLDBERG, JOHNSON and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Petitioners, Raul Quan Young and Grace Larrad de Quan, who are husband and wife and citizens of Guatemala, seek review of deportation orders issued by an immigration judge of the Department of Justice. The immigration judge found that the Quans were deportable aliens who were not eligible for asylum or withholding of deportation as political refugees. The Board of Immigration Appeals dismissed the Quans' appeal of this order; we affirm. The Quans also sought to reopen their bond determination hearings. The immigration judge declined to reopen the proceedings; the Board of Immigration Appeals affirmed. Finding no jurisdiction to review the Board's determination, we dismiss this portion of the Quans' petition.

## I.

Mr. Quan is a civil engineer and the former chief of the Department of Studies and Design at the Guatemalan Institute of Municipal Development, an agency of the Guatemalan government. In January 1982, Mr. Quan was dismissed from his position at the Institute, allegedly without notice or explanation. Mr. Quan then sought other employment as a civil engineer in Guatemala but was unable to obtain a position.

Mr. Quan attributes his loss of employment and his inability to obtain new employment to the political activities of his son, Raul. During 1980 and 1981, Raul was a student at the University of San Carlos and a member of an organization with both charitable and political objectives. Raul testified that in November 1981, he and a number of other student members of this organization were seized by the Guatemalan secret police during a meeting in a classroom at the university and were taken to a municipal building in the center of Guatemala City, where they were beaten and accused of being subversives and communists. According to Mr. Quan, he quickly learned of his son's detention and, with the assistance of a personal friend in the Ministry of the Interior, was able to have Raul released. Raul, who held a valid passport and visa, immediately departed for the United States. Raul testified that at least two of the students who were detained with him were later found murdered with marks of torture on their bodies.

Mr. Quan testified to additional incidents in support of his claim of political persecution. Mr. Quan asserted that approximately a week after Raul's flight to the United States, several men armed with the type of weapons issued to the Guatemalan secret police attempted to kidnap him, without success, on a street in Guatemala City. Mr. Quan contends that before his employment with the Guatemalan government was terminated, he received several threatening telephone calls warning him to be "careful in his job."

In November 1982, Mr. Quan came to the United States with a valid passport and multiple entry tourist visa. After arrival in this country, Mr. Quan applied to a district director of the Immigration and Naturalization Service (INS) for asylum, 8 U.S.C. § 1158, and was granted work authorization. Mrs. Quan remained in Guatemala but made frequent trips to the United States. She last entered the United States on June 11, 1983, on a tourist visa which

was extended to permit her to remain until December 11, 1983.[1]

Between July 8 and November 2, 1983, the INS and the United States Department of Justice received several telexes from the United States embassy in Guatemala and from the Guatemalan office of Interpol. These telexes relayed an accusation by the Guatemalan government that Mrs. Quan had engaged in baby smuggling and had ordered the murder of four people in Guatemala. These telexes also accused Mr. Quan of fraudulently obtaining $13,000,-000. The Guatemalan government initially expressed an interest in extraditing the Quans but did not complete formal extradition requests for either of them.

On October 21, 1983, the INS made a warrantless arrest of the Quans and their children (aged fourteen, nine and three) at the Quans' home in New Orleans. The INS served Mr. Quan an order to show cause why he should not be deported for having overstayed his non-immigrant visa, 8 U.S.C. §§ 1251(a)(2), 1201(a)(2). Mrs. Quan was served a similar order alleging that she entered the United States with the unlawful intention of remaining indefinitely, 8 U.S.C. §§ 1251(a)(1), 1182(a)(20). Over the twelve days following their arrest, the Quans were detained and interrogated. The Quans assert that they were not informed of the charges against them and were not permitted to consult an attorney until November 2, 1983.

A deportation hearing was held November 2 and 4, 1983, on the charges made against the Quans in the orders to show cause. On November 4, both Mr. and Mrs. Quan, with the assistance of counsel, responded to questions posed by the immigration judge, admitted the charges against them, conceded that they were deportable, and requested deportation to Costa Rica. Costa Rica, however, refused to accept the Quans. Pursuant to a stipulation with the INS, the Quans were permitted to reopen their hearings to request asylum or, in the alternative, withholding of deportation.

The stipulation did not allow the Quans to withdraw their concessions of deportability but did permit them to avoid deportation if they could establish that they would be subject to persecution if deported to Guatemala. Nevertheless, at Mrs. Quan's reopened hearing, she attempted to retract her admission of the charges against her and her concession of deportability on grounds that these admissions had been coerced. The immigration judge refused to permit this retraction holding that the admissions had been made knowingly and voluntarily.

At the reopened hearings, the immigration judge heard testimony from Mr. Quan and his son Raul regarding their experiences in Guatemala, and received evidence regarding the general climate of political repression and violence in that country. The immigration judge found that Mr. Quan failed to establish that his economic difficulties in Guatemala were the product of retribution for his political opinions or that he would be persecuted on account of his political opinions if he were returned to Guatemala. The Quans' request for asylum or withholding of deportation was denied and they were ordered deported; an appeal from this decision was dismissed by the Board of Immigration Appeals.

Following their arrest on October 21, 1983, the Quans were held without bond. On November 2, 1983, a hearing was held at which bond was set at $15,000 for Mr. Quan and at $30,000 for Mrs. Quan. By joint stipulation, Mr. Quan's bond was then reduced to $5,000. The Quans later moved to reopen their bond proceedings on the ground that the Guatemalan government's abandonment of any attempt to extradite them rendered the relatively high bonds unnecessary. The immigration judge refused to reopen the proceedings; the Board of Immigration Appeals affirmed.

On petition for review to this court, the Quans request that their deportation orders be vacated, asserting that coerced concessions of deportability were improperly

---

**1.** No contention is made that Mrs. Quan was mistreated by government officials during the eight months she remained in Guatemala without her husband.

received at their deportation hearings and that the Board of Immigration Appeals erred in concluding that they were ineligible for asylum or withholding as political refugees; alternatively, the Quans seek an order reopening their deportation hearings for the reception of new evidence. As a separate matter, the Quans seek review of the Board of Immigration Appeals' refusal to reopen their bond hearings.

## II.

Mrs. Quan alleges that the immigration judge erred in concluding from the record that her concession of deportability was voluntary, in refusing to permit her to retract her concession of deportability, and in declining to terminate her deportation proceedings.[2] Mrs. Quan asserts that her concession was illegally obtained through coercive tactics of the INS, including her warrantless arrest, denial of counsel for twelve days, and abusive interrogation. Mrs. Quan asserts that the admission of a concession obtained by such means violates constitutional rights secured by the fourth and fifth amendments, statutory provisions prohibiting warrantless arrests of aliens for any cause other than certain violations of the immigration laws, 8 U.S.C. § 1357(a)(2), (4),[3] and provisions assuring notice of charges and access to counsel, 8 U.S.C. § 1252(b)(1), (2); implemented by 8 C.F.R. §§ 242.1(b), 287.3. Since Mrs. Quan's concession of deportability was the sole evidentiary basis for her deportation order, Mrs. Quan argues that the deportation order is not supported by "reasonable, substantial, and probative evidence", 8 U.S.C. § 1105a(a)(4), and, hence, must be vacated.

Deportation hearings are civil actions to determine an alien's eligibility to remain in this country and do not have the character of criminal proceedings. *INS v. Lopez-Mendoza,* —— U.S. ——, 104 S.Ct. 3479, 3484, 82 L.Ed.2d 778 (1984). The full range of constitutional rights available in criminal proceedings is not afforded defendants in deportation proceedings. *Id.* 104 S.Ct. at 3490. *Lopez-Mendoza* teaches that, in general, a fourth amendment challenge to an evidentiary offering is effective only if the evidence is obtained by means which "might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." Id. at 3490. Our cases apply a similar "fundamental fairness" analysis to evidence challenged as inadmissible under the due process clause of the fifth amendment. See *Soto-Hernandez v. INS,* 726 F.2d 1070, 1072 (5th Cir.1984) (citing *Tashnizi v. INS,* 585 F.2d 781, 782–83 (5th Cir.1978)) (hearsay evidence).

Since Mrs. Quan seeks to repudiate a concession made at a deportation hearing, our focus is on the voluntariness of Mrs. Quan's concession. See *Carnejo-Molina v. INS,* 649 F.2d 1145, 1148–49 (5th Cir.1981); *Rodriguez-Gonzalez v. INS,* 640 F.2d 1139, 1140–41 (9th Cir.1981). Mrs. Quan admits that she had full opportunity to consult with counsel from November 2 to November 4, 1983, before conceding her deportability. At the November 4 hearing, Mrs. Quan's attorney admitted to the immigration judge that Mrs. Quan was deportable. Mrs. Quan then stated unequivocally that she understood and agreed with the admission of deportability made by her attorney.[4] Mrs. Quan does not contend that

---

2. Mr. Quan raises a similar claim. However, his failure to assert this claim in the proceedings below bars our consideration of it on appeal. See 8 U.S.C. § 1105a(c); *Ka Fung Chan v. INS,* 634 F.2d 248, 258 (5th Cir.1981).

3. Mrs. Quan contends that the INS did not arrest her with a good faith belief that she had entered the United States unlawfully, but rather that the INS took her into custody for the purpose of holding her until the Guatemalan government executed an extradition request

based upon the crimes alleged in the telexes received by the INS.

4. The following colloquy took place between the immigration judge and Mrs. Quan:

Judge to the Respondent through the Interpreter:

Q. Ms. Quan, your attorney has admitted that you came to the United States without the proper documentation to be a Permanent [sic] resident, has admitted that you are deportable, and has chosen Costa Rica

the INS threatened any form of reprisal if she failed to concede her deportability. The record supports a finding that the concession was voluntary; the Board of Immigration Appeals' conclusion that Mrs. Quan was deportable is supported by "reasonable, substantial, and probative evidence." See 8 U.S.C. § 1105a(a)(4).

### III.

■ Mr. Quan asserts that the immigration judge's denial of his application for asylum, 8 U.S.C. § 1158(a), 1101(a)(42)(A), was an abuse of discretion and that the immigration judge's denial of his application for withholding of deportation, 8 U.S.C. § 1253(h), was not supported by substantial evidence.[5] These two remedies, asylum and withholding of deportation, are completely separate although both are designed to provide relief to aliens who fear political persecution in their native countries. The Attorney General has discretion to grant asylum to an alien who is physically present in the United States if the alien is unable or unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or po-

litical opinion", 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(a). The related remedy, withholding of deportation, must be granted if an "alien's life or freedom would be threatened [upon deportation] on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1).

■ In *INS v. Stevic*, — U.S. —, 104 S.Ct. 2489, 2492, 2501, 81 L.Ed.2d 321 (1984), the Court held that an alien could qualify for withholding of deportation by showing a "clear probability" of persecution should he be deported—"evidence establishing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds." Upon that showing, the alien is entitled to withholding as a matter of right. *Stevic*, 104 S.Ct. at 2496 n. 15. The Court declined to elaborate on the meaning of the "well-founded fear of persecution" standard an alien must meet to obtain asylum under section 1101(a)(42)(A). *Stevic*, 104 S.Ct. at 2501. The alien, however, clearly bears the burden of proving entitlement both to asylum and withholding. 8 C.F.R. §§ 208.5, 242.17(c); *Stevic*, 104 S.Ct. at 2497 n. 16; *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1042–43 (5th Cir.1982).[6] Under

---

for the country of your deportation, and has asked for your deportation to that country. Do you understand?
A. Yes, I understand.
Q. Do you agree with her action?
A. Yes, I'm in agreement.

5. As a related matter, Mr. Quan asserts, in conclusory fashion, that following his asylum application to a district director, the institution of deportation proceedings penalized him on account of his status as a political refugee, in violation of article 31 of the United Nations Convention Relating to the Status of Refugees, done July 28, 1951, 189 U.N.T.S. 150, which is incorporated by the United Nations Protocol Relating to the Status of Refugees, done Jan. 31, 1967, 19 U.S.T.S. 6223, T.I.A.S. No. 6577 (entered into force with respect to the United States, Nov. 1, 1968). Article 31(1) states:

The Contracting States shall not impose penalties on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened ..., enter or are present in their territory without authorization, provided

they present themselves without delay to the authorities and show good cause for their illegal entry or presence.
Mr. Quan does not disclose how he has been penalized and we perceive no penalty because he was required to litigate his asylum claim before an immigration judge in a deportation proceeding, rather than before a district director.
Mr. Quan also argues that the INS' internal Operations Instructions prohibited initiation of deportation proceedings against him for overstaying his visa before disposition of his asylum application by the district director. Mr. Quan failed to raise this issue in the administrative proceedings below and we are without jurisdiction to consider it. See U.S.C. § 1105a(c); *Ka Fung Chan*, 634 F.2d at 258.

6. The Attorney General's denial of discretionary relief, such as asylum, may not be disturbed by this court absent a showing that such action was arbitrary, capricious or an abuse of discretion. See *Daniel v. INS*, 528 F.2d 1278, 1280 (5th Cir.1976) (review under prior statute of discretionary denial of withholding of deportation).

either a strict "clear probability" standard or a possibly more liberal "well-founded fear" standard, the fact finder was justified in concluding that Mr. Quan failed to demonstrate that he will be persecuted on account of his political opinions if he is returned to Guatemala.[7]

Mr. Quan has never directly engaged in political activity in Guatemala. His fear of political persecution stems from his son's political activity. Mr. Quan established that this was a *possible* explanation for his misfortune. The evidence, however, suggests other explanations for Mr. Quan's unfortunate experiences which are at least as plausible as government retribution for his son's political activity.

Mr. Quan presented no direct evidence of a link between the events concerning his son and his own loss of employment. While Mr. Quan apparently has good professional credentials, it is certainly possible that he was dismissed either for legitimate work-related reasons or purely personal reasons. Mr. Quan's age—58—could well explain his inability to secure new employment. This is particularly true given the difficult economic conditions which prevail in Guatemala.

Even if Mr. Quan's testimony relating to the attempt to kidnap him and the telephone warnings is accepted as true, he nevertheless failed to adduce convincing positive evidence that these events either were sponsored by the government or were in retaliation for Mr. Quan's intervention on his son's behalf. The charges of serious criminal activities on the part of the Quans

made by the Guatemalan government do show an official source. Assuming these charges were fabricated, there is still no clear indication that the charges were in retribution for Mr. Quan's limited political activity. In sum, we are not persuaded that the denial of Mr. Quan's request for asylum was an abuse of discretion or that the denial of withholding was not supported by substantial evidence.[8]

## IV.

The Quans seek to reopen their deportation proceedings so they may offer new evidence consisting of: (1) a letter from a Guatemalan attorney asserting that he has searched for a record of criminal charges pending against Mrs. Quan in Guatemala City and discovered none, (2) a letter from a Guatemalan attorney indicating that the search conducted in Guatemala should have revealed any charges pending against Mrs. Quan, (3) an affidavit from Mr. Quan asserting that his daughter was recently detained and questioned regarding her parents' whereabouts by the Guatemalan secret police at the Guatemala City airport while she was attempting to send a letter from Guatemala to the United States.

We are authorized by 28 U.S.C. § 2347(c) to order administrative agencies, including the Board of Immigration Appeals, to reopen proceedings to receive and consider further material evidence if a party shows reasonable grounds for its earlier failure to produce the evidence before the agency. See *Vargas-Gonzalez v. INS*, 647

---

The Attorney General's denial of withholding (under the present statute) must be sustained if it is supported by reasonable, substantial and probative evidence. See 8 U.S.C. § 1105a(a)(4).

**7.** Several letters from the Quans' friends were submitted which confirmed the high moral character of the Quans, that the Quans' son was arrested and beaten, that Mr. Quan was fired and unable to secure new employment and the Quans' account of the general political oppression in Guatemala. The above facts were not in serious dispute and the letters were cumulative on these issues. On the critical question of whether the Quans' problems were the result of their son's political activity, the Board of Immi-

gration Appeals was justified in describing the contents of the letters as containing "principally only conclusional assertions and a paucity of detailed, first-hand observations and facts." Board's Decision at p. 2, n. 1. We are satisfied from the Board's opinion that it gave adequate consideration to these letters. We do not require the Board to give an "extended discussion of evidentiary minutia" to establish adequate consideration of the evidence before it. *Ramos v. I.N.S.*, 695 F.2d 181, 189 (5th Cir.1983).

**8.** Mrs. Quan filed a petition for asylum derivative of her husband's, 8 U.S.C. § 1158(c). For the reasons stated above, Mrs. Quan's request for asylum was properly denied.

F.2d 457, 458–59 (5th Cir.1981); *Coriolan v. INS*, 559 F.2d 993, 1002–04 (5th Cir. 1977). In this case, however, we are not persuaded that the proferred evidence is significant and we therefore decline the invitation to order a new hearing.[9] The evidence the Quans seek to submit is largely cumulative. Moreover, the proferred evidence concerning Mr. Quan's claim of persecution, if credible, fails to demonstrate that the misfortune which has befallen the Quans is the result of retribution for Mr. Quan's political opinions.

## V.

The Quans assert that the Board of Immigration Appeals erred in refusing to reopen their bond determination hearings in light of the Guatemalan government's failure to substantiate its accusations of criminal conduct. The government responds that we are without jurisdiction to consider this claim.

Our jurisdiction to entertain direct appeals from the Board of Immigration Appeals is confined to "final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings under [8 U.S.C. §] 1252(b)...." 8 U.S.C. § 1105a(a). Bond determination hearings are conducted pursuant to authority granted the Attorney General under 8 U.S.C. § 1252(a) and, by regulation (8 C.F.R. § 242.2(b)), such hearings are separate and distinct from proceedings to determine an alien's deportability. Hence, we possess no jurisdiction to exercise direct review over the Board of Immigration Appeals' refusal to reopen the Quans' bond hearings, and we dismiss the Quans' petition for review of this order.[10] Accord *Gornicka v. INS*, 681 F.2d 501,

504–06 (7th Cir.1982); *Castaneda ex rel. Gonzalez-Gonzalez v. INS*, 740 F.2d 9, 10 (8th Cir.1984).

The Board of Immigration Appeals' dismissal of the appeals of the deportation orders is AFFIRMED; the petition for review of the Board of Immigration Appeals' bond orders is DISMISSED.

GOLDBERG, Circuit Judge, dissenting:

Although Judge Davis has cogently presented the restrictive framework within which we must review the Board's final order, neither the administrative officer nor the Board seems to have considered the entire record in arriving at its decision. Hence my respectful dissent.

The settled law of this circuit is that a decision whether to withhold deportation or to grant asylum must be based on a considered examination of all relevant factors and evidence. *Ramos v. INS*, 695 F.2d 181, 189 (5th Cir.1983); *Coriolan v. INS*, 559 F.2d 993, 1003–04 (5th Cir.1977); *accord Zavala-Bonilla v. INS*, 730 F.2d 562, 563–67 (9th Cir.1984); *see Sanchez v. INS*, 755 F.2d 1158 (5th Cir.1985). The opinions of the immigration judge and the Board do not adequately reflect that all relevant evidence was weighed in the decision to deny withholding and asylum. *See Osuchukwu v. INS*, 744 F.2d 1136, 1142–43 (5th Cir. 1984). Petitioners offered three letters from individuals in Guatemala supporting Mr. Quan's belief that he had been fired because of his son's political affiliation and stating that "the lives of the whole family would be in grave danger of death, considering the current political situation." The Board dismissed the letters in a footnote as being nothing more than "so-called objec-

---

9. The Quans also request that their deportation hearings be reopened to consider additional evidence suggesting that their concessions of deportability were coerced by the INS. We reject this request due to the Quans' failure either to describe the nature of the evidence they propose to offer or to provide a reasonable excuse for not presenting this evidence in their immigration proceedings.

10. We acknowledge that the scope of our jurisdiction under 8 U.S.C. § 1105a(a) includes "all matters on which the validity of the final order [of deportation] is contingent" regardless of the nature of the forum in which these matters are determined, *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 2777–78, 77 L.Ed.2d 317 (1983). Since the validity of the Quans' final order of deportation is not contingent upon these bond determinations, this jurisdictional base is not relevant to this appeal.

tive evidence," and the immigration judge's opinion, generously read, mentioned only one of the three letters that were in the record and discounted even that one letter without any suggested justification. Apart from issues of credibility or persuasiveness, the Board's failure to consider these letters as objective evidence constitutes reversible error even under the most deferential abuse of discretion standard. *Ramos*, 695 F.2d at 185–88.

We have previously required greater substantiation of final orders of deportation by the INS:

> [T]he decision of the immigration authorities must affirmatively reflect that they have meaningfully addressed and reached a reasoned conclusion concerning all the factors relevant to that determination which are based on evidence, a requirement that the Board itself abstractly recognized, but did not apply.

*Id.* at 189 (citing *Prapavat v. INS*, 662 F.2d 561, 562 (9th Cir.1982)). Moreover, while we have not expressly held that letters such as petitioners' constitute relevant and material objective evidence for purposes of asylum and withholding of deportation claims, the Ninth Circuit has had occasion to hold just that. *Zavala-Bonilla*, 730 F.2d at 565–67. The court of appeals' expression of the petitioner's situation in *Zavala-Bonilla* is equally apt on the facts of our case:

> [T]he BIA denigrated the letters as gratuitous speculations that refer only generally to Zavala-Bonilla's past union activities, the current unemployment situation and human rights violations in El Salvador, and possible dangers Zavala-Bonilla would face were she to return to her native land. The record, however, does *not* support the BIA's treatment of the letters. There is no evidence that the letters are false. While one might infer that her friends in El Salvador would tend to write supportive letters, it is difficult to imagine, given her circumstances, what other forms of testimony Zavala-Bonilla could readily present. She could hardly ask the authorities in El Salvador to certify that she would be persecuted should she return. Furthermore, the letter writers undoubtedly placed themselves at risk merely by writing. Their understandable fear of reprisal may also account for the letters' lack of specificity.

> . . . .

> On remand, the BIA should fully consider the letters from Zavala-Bonilla's friends and her union.... [I]n considering the record as a whole, the BIA should bear in mind the difficulties an alien encounters in providing proof of potential persecution. *See McMullen [v. INS*, 658 F.2d 1312, 1319 (9th Cir.1981) ]; United Nations High Commissioner for *Refugees' Handbook on Procedures for Determining Refugee Status* (Geneva 1979) (because aliens have difficulty collecting proof, credible accounts should be given the benefit of the doubt).

*Id.* at 565, 567 (footnote omitted); *see also Coriolan*, 559 F.2d at 1004.

Because the administrative opinions in our case reflect only a cursory acknowledgment that petitioners' letters had been submitted, I would remand with instructions for the Board to consider the entire record, including these letters and any additional relevant and material evidence that may have been adduced since the Board filed its final order some nine months ago.