Ramona **ZAMORA–GARCIA,** Petitioner,

v.

**UNITED STATES DEPARTMENT OF JUSTICE IMMIGRATION & NATURALIZATION SERVICE,** Respondent.

**No. 83–4350 Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

July 30, 1984.

Robert A. Shivers, San Antonio, Tex., for petitioner.

William French Smith, Atty. Gen., U.S. Dept. of Justice, Hillary B. Burchuk, Charles E. Hamilton, III, Washington, D.C., David H. Lambert, Dist. Dir., INS, New Orleans, La., Richard M. Casillas, Dist. Dir., INS, San Antonio, Tex., for respondent.

## ON PETITION FOR REHEARING

(Unpublished Opinion, 724 F.2d 974, January 13, 1984)

Before BROWN, TATE and HIGGINBOTHAM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

On March 30, 1980, Ramona Zamora-Garcia was found to be a deportable alien who had entered the United States without valid entry documents in 1973. She filed for a Suspension of Deportation under 8 U.S.C. § 1254 on that same date. On April 6, 1982, the Immigration Judge (ILJ) denied her request, she appealed this decision, and her appeal was dismissed by order of the Board of Immigration Appeals (Board) on May 18, 1983. The Board's dismissal was originally before us on appeal for a determination of whether the Board abused its discretion in failing to find that deportation would cause appellant "extreme hardship" sufficient to invoke the relief provided by § 1254. We have reconsidered our original unpublished opinion in light of the Board's petition for rehearing, and find the issues worthy of further consideration as well as publication. The petition for rehearing is therefore GRANTED, and we substitute

the following published opinion in lieu thereof.

### Facts

Ramona Zamora-Garcia is a 32 year old unmarried native citizen of Mexico. She came to the United States in 1969, when she was 17 or 18 years old, and since then has lived with and been employed by Ms. Marilyn Chrisman. Ramona is the Chrismans' housekeeper, and has cared for the two Chrisman children since they were very small. Ms. Chrisman testified in Ramona's behalf in 1982 at the suspension hearing, and stated that the Chrismans consider Ramona "a member of our family." Ramona has lived with the Chrismans continuously since 1969, with the exception of a three week visit to her family in Mexico in 1973. Although she receives a two week vacation each year and has saved $4500, Ramona has chosen not to return to Mexico for her vacations because she no longer feels welcome in her father's home.

The relative to whom Ramona feels closest is her sister, Elia Zamora, who also came to the United States in 1969 and was initially found to be deportable along with Ramona. Elia, however, was granted a Suspension of Deportation because she had married a lawful permanent resident. Besides her father, who has remarried, Ramona's relatives in Mexico include three married sisters and brothers and one unmarried brother. Ramona stated that if she returned to Mexico, she could not live with her father because he lives in her stepmother's house and the two women are estranged. This is why she has not returned to Mexico for a visit in more than ten years. She further stated that her sisters and brothers now have lives of their own, and she could not live with them either.

To be considered for a Suspension of Deportation, the respondent has a duty to prove three things—first, that she has been physically present in the United States for a continuous period of not less than seven years; second, that she has been a person of good moral character during that time; and third, that deportation would cause her extreme hardship. *See* 8 U.S.C. § 1254. There is no dispute that Ramona meets the first two criteria. However, the Board affirmed the ILJ's finding that she had failed to meet her burden of demonstrating extreme hardship. She therefore was not considered for a Suspension of Deportation.

### Standard of Review

■ We recognize from the outset that the "decision whether to suspend the deportation of an alien who satisfies the three statutory requirements is discretionary, and is subject only to a most restricted judicial review." *Ramos v. Immigration & Naturalization Service*, 695 F.2d 181, 184–85 (5th Cir.1983). The first two requirements, continuous residency for at least seven years and good moral character, are findings of fact which are to be determined from the evidence "on the record as a whole." Thus, as to the first two requirements, we decline to rule upon decisions by the Board or ILJ that are supported by substantial evidence. *See* 8 U.S.C. § 1105a(a)(4). As to the requirement of extreme hardship, however, we have held that under the Supreme Court's decision in *Immigration and Naturalization Service v. Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981), that factor is to be reviewed under the more limited "abuse of discretion" standard. *Ramos, supra,* 695 F.2d at 185. We recognized in *Ramos* that the Act specifically grants the Attorney General the authority to determine the existence of extreme hardship, and that the provision may be quite narrowly construed. *Id.*

■ Although we held in *Ramos* that there was little opportunity for "substantive" judicial review of adverse determinations of extreme hardship, we may review these determinations "procedurally" to ensure that the complaining alien has received full and fair consideration of all circumstances that give rise to his or her claims. *Id.* at 186. Under such circumstances, Courts of Appeal have remanded to the Board for reconsideration in light of

the relevant factors it may have failed to consider. *See, e.g., Prapavat v. Immigration & Naturalization Service,* 638 F.2d 87 (9th Cir.1981), *aff'd on rehearing,* 662 F.2d 561, 562 (9th Cir.1982); *Santana-Figueroa v. Immigration & Naturalization Service,* 644 F.2d 1354, 1356–57 (9th Cir. 1981); *Ravancho v. Immigration & Naturalization Service,* 658 F.2d 169, 174–76 (3d Cir.1981); *Antoine-Dorcelli v. Immigration & Naturalization Service,* 703 F.2d 19, 21 (1st Cir.1983).

■ We held in *Ramos* that for the Attorney General properly to fulfill his discretionary obligation, he or his delegates must *actually consider* "the facts and circumstances respecting each petitioner's claim of extreme hardship." *Ramos, supra,* 695 F.2d at 188, *citing Santana-Figueroa, supra,* 644 F.2d at 1356. We require that the Board "meaningfully address ... each of the alien's assertions of hardship that are based on evidence," giving reasons for denying relief that reflect full consideration of the evidence. *Ramos* at 188. In reviewing Board decisions on hardship, we base our decision on the Board's articulation of its reasons for denying relief rather than our own assumptions. *Id.*

### Extreme Hardship: Relevant Factors

■ It is well established that the adverse economic impact of deportation alone is insufficient to justify a finding of extreme hardship. In this case the ILJ found, and the Board affirmed, that the "most that can be said of respondent's case is that deportation to Mexico would result in economic hardship because employment opportunities in that country are not equal to ours." The ILJ found that Ramona's case was "not unlike" *Pelaez v. Immigration & Naturalization Service,* 513 F.2d 303 (5th Cir.) *cert. denied,* 423 U.S. 892, 96 S.Ct. 190, 46 L.Ed.2d 124 (1975), where we

affirmed the Board's finding of no extreme hardship in the petitioner's claims. In *Pelaez,* the alien based her claim of hardship on the difficulty in obtaining employment and the lower standard of living in her native country, coupled with the impossibility of obtaining a return visa and the inability to continue to contribute to the support of her family. *Id.* at 305, n. 1. In *Pelaez,* we pointed out but did not specifically address the petitioner's claim that deportation would disrupt "the way of life to which she had become accustomed." *Id.* at 304. We therefore cannot determine in this situation that the ILJ's citation to *Pelaez* amounted to adequate consideration of Ramona's non-economic claims of extreme hardship. We find instead that this case presented several factors not present in *Pelaez* that were relevant to Ramona's claims of hardship, yet were not considered in the proceedings below in accordance with the standards we have set out.

First, both petitioner and her friend and employer, Ms. Chrisman, testified that Ramona is considered a member of the Chrisman family. She has "reared" the Chrisman children for 14 years now, and she participates in family activities. Ms. Chrisman was concerned by the fact that Ramona did not wish to return to Mexico for her vacations and took it upon herself to speak to Ramona's father about the problem, which has never been resolved. When Ramona became involved in some minor trouble with the police,[1] the Chrismans were fully supportive of her and now vouch for her complete honesty and high moral character.

■ The estrangement from her natural family, coupled with the development of close ties with her "American" family calls into question the ILJ's finding that Ramona has no "close family ties in this country." [2] We are in accord with the First

---

[1] Ramona and her sister Elia were arrested for shoplifting in a supermarket on April 18, 1980. Ramona had taken items worth less than $5.00, and the charges were dismissed after she participated in Project Detour, a rehabilitation program for first-time offenders. This incident was

considered by the ILJ, who found it no bar to a finding of good moral character.

[2] We recognize, as should the Board, the nature of the hardship posed by the separation of family members. In *Mejia-Carrillo v. Immigration & Naturalization Service,* 656 F.2d 520, 521–22 (9th

Circuit in finding that it "is unrealistic as well as unjust to adopt such a rigid view of the family unit" as to find that only blood relations may constitute "family." *Antoine-Dorcelli v. Immigration & Naturalization Service*, 703 F.2d 19, 21 (1st Cir. 1983). In *Antoine-Dorcelli*, the Government sought deportation of a 49 year old native Haitian woman who had been in Puerto Rico since 1970. Prior to her arrival in Puerto Rico, she had lived and worked in Haiti for about 20 years as a servant to the mother of the woman with whom she came to stay in Puerto Rico, Mrs. Craig. Antoine-Dorcelli, like Ramona, had developed a particular attachment to Mrs. Craig's children and indeed had arrived in Puerto Rico in 1970, a year later than Ramona arrived in Texas. The First Circuit reversed and remanded the Board's denial of Suspension of Deportation, finding that the Board had improperly failed to consider the hardship to the petitioner arising from her separation from the Craigs.

Antoine-Dorcelli, like Ramona, had living family members in her native country. The Government attempts to distinguish the case by emphasizing that Antoine-Dorcelli had had "little or no contact" with her family in Haiti since she was a small child, whereas Ramona left Mexico as a young teenager and has since maintained some contact with her family. The Government further stresses the fact that Ramona is paid a salary and receives a vacation, while Antoine-Dorcelli's "needs" were provided for by the Craigs as they arose. We do not find Ramona's status as an employee dispositive—indeed, the *Antoine-Dorcelli* Court pointed out Antoine-Dorcelli's non-employee status solely for the purpose of illustrating that she would suffer *economic* hardship if deported in addition to the emotional trauma of separating from the Craigs. Similarly, we find that despite Ramona's infrequent contact with her family in Mexico, her situation is not so vastly different from Antoine-Dorcelli's that we

can say the Board's failure to consider the emotional hardship posed by separation from the Chrisman family was proper. We add that it appears from the facts of *Antoine-Dorcelli* that the Haitian woman did not leave her country until she was roughly 36 years of age, whereas Ramona left at age 17 or 18, during the more critical years of young adulthood.

The *Antoine-Dorcelli* Court also pointed out that if there had been evidence that Antoine-Dorcelli's relationship with the Craig children " 'closely resembled that of parent to child,' " then "consideration of the harm suffered by [the Craig] children as a result of petitioner's deportation might also have been merited." *Antoine-Dorcelli, supra,* 703 F.2d at 22 & n. 3, *citing Tovar v. Immigration & Naturalization Service,* 612 F.2d 794, 797 (3d Cir.1980). We originally directed the Board to consider the harm to the Chrisman children, who have been raised by Ramona, rather than merely concluding in its written opinion that "[n]o consideration" could be given to this factor "since ... [the Chrismans and Ramona] do not have the familial relationship set forth" in the statute. In so doing, we relied on the *Antoine-Dorcelli* Court's supposition as well as on *Tovar,* the Third Circuit Case upon which the First Circuit relied. In light of a Supreme Court decision unavailable during our initial deliberations, we have concluded that that reliance may have been incorrect.

*Tovar* extended the statutory language of § 1254 to include hardship not only to the deportee's "spouse, parent, or child, who is a citizen of the United States" but also to the deportee's grandchild. The *Tovar* Court held that the proper focus was whether the deportee's relationship to her grandchild "so closely resembled that of parent to child" that the hardship to the grandchild from the grandmother's deportation should be considered. *Tovar, supra,* 612 F.2d at 794. *Tovar* relied for this

---

Cir.1981), the Ninth Circuit held that the "most important single factor [in determining extreme hardship] may be the separation of the alien from family living in the United States.... separation from family alone may establish extreme hardship." *Id. See also Bastida v. Immigration & Naturalization Service,* 609 F.2d 101, 104–05 (3d Cir.1979).

proposition upon *Vergel v. Immigration & Naturalization Service*, 536 F.2d 755, 757 (8th Cir.1976). In *Vergel*, the Court determined that deportation would cause severe hardship not only to the Filipino deportee, but also to an invalid child she had nursed almost since birth. *Id.* Although the Court could not grant the relief sought,[3] on the basis of this hardship it stayed issuance of its mandate to allow the petitioner time to apply for a discretionary stay on humanitarian grounds. *Id.* at 757–58. In *Vergel*, like the case before us, the child and her parents were lawful residents of the United States unrelated to the petitioner.

In its petition for rehearing, the INS argues that in *Contreras-Buenfil v. Immigration & Naturalization Service*, 712 F.2d 401 (9th Cir.1983), the Ninth Circuit questioned the continuing precedential value of *Tovar* in light of the Supreme Court's decision in *Immigration & Naturalization Service v. Jong Ha Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981). In *Jong Ha Wang*, the Court held that a Court of Appeals may not substitute its determination of "extreme hardship" for that of the Board. *Id.* 450 U.S. at 145, 101 S.Ct. at 1027. As we pointed out earlier, however, *Jong Ha Wang* does not preclude procedural review of Board decisions to ensure fair consideration of all factors giving rise to the alien's claim of hardship. *See* discussion of *Ramos, supra*, 695 F.2d at 186.

Thus, although we may find an abuse of discretion in the Board's utter failure or refusal to consider relevant hardship factors, we recognize that we lack the authority to determine the weight, if any, to be afforded each factor. Similarly, we may not assess the credibility of the witnesses or evidence that purport to prove the existence of each factor. We do not think that our review, so limited, constitutes a substitution of our view for that of the Board in a manner forbidden by *Jong Ha Wang*.

We are thus unpersuaded by the Ninth Circuit's reasoning in *Contreras-Buenfil*.

However, that is not the only argument set out in the petition for rehearing. The INS also argues that our direction that the hardship to the Chrisman children be considered impermissibly expands the language of § 1254(a)(1) beyond its terms. We concede that the plain language of the statute provides only for consideration of extreme hardship "to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residency." 8 U.S.C. § 1254(a)(1). On rehearing, we think our earlier liberal interpretation of the statute, then in accord with *Antoine-Dorcelli, Tovar*, and the spirit of *Vergel*, is precluded by the Supreme Court's decision in *Immigration & Naturalization Service v. Phinpathya*, —— U.S. ——, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984).

In reviewing the "continuous physical presence" requirement of § 1254(a)(1), the Supreme Court declined to apply any interpretation other than the "plain meaning" approach to the 32 year old statute. —— U.S. at ——, 104 S.Ct. at 590, 78 L.Ed.2d at 410. The Court relied upon the legislative history of the 1952 amendments, pointing out that Congress had deliberately "made the criteria for suspension of deportation more stringent both to restrict the opportunity for discretionary action" and to keep out

"aliens [who] are deliberately flaunting our immigration laws by ... gaining admission into the United States illegally ... with the intention of establishing themselves in a situation in which they may subsequently have access to some administrative remedy to adjust their status to that of permanent residents."

*Phinpathya, supra*, —— U.S. at ——, 104 S.Ct. at 590, 78 L.Ed.2d at 409–410, *citing*

---

**3.** The *Vergel* Court concluded that it had no jurisdiction to review the original deportation order because a timely appeal was lacking, and could find no abuse of discretion in the denial of the motion to reopen because the petitioner could not meet the statutory seven years' residency requirement. *Id.* at 757.

S.Rep. No. 1137, 82d Cong., 2d Sess., pt. 1, 25 (1952).[4]

■■■ Although the Supreme Court's ruling only specifically has an impact upon the "continuous physical presence" requirement, we—without so deciding—have doubts that the Court would approach the "extreme hardship" requirement any differently. We therefore recognize—although perhaps reluctantly—that the Board need not consider the hardship to the Chrisman children posed by the possibility of Ramona's deportation. We emphasize, however, that we do require consideration of the hardship to Ramona posed by the possibility of separation from the Chrismans.[5]

In its reconsideration on remand the Board should also take into account the Ninth Circuit's decision in *Santana-Figueroa v. Immigration & Naturalization Service*, 644 F.2d 1354 (9th Cir.1981), where the Court of Appeals reversed and remanded because the Board had "disregarded the possibility that extreme hardship would result from the combined effect of depriving the petitioner of his livelihood and uprooting him from a community to which he had belonged and contributed for more than a decade." *Id.* at 1357. The petitioner in that case was a 70 year old unskilled maintenance man who had lived and worked in the United States for 14 years, supporting himself and his family who lived in Mexico without public assistance. *Id.* at 1355. Due to his advanced age, the economic situation confronting him was possibly more severe than Ramona's, but the noneconomic factors justifying remand were substantially *less* severe. The *Santana-Figueroa* Court held that the Board should have considered the hardship resulting from the petitioner's separation from his church, friends, and American society in general. *Id.* at 1357. Ramona, on the other hand, would leave behind the family with whom she has lived for nearly half her entire life (indeed, *all* her adult life), the children she has raised, and the blood relative to whom she feels closest.[6]

---

**4.** The relevant portions of the Act have not changed significantly since 1962, when the words "exceptional and extremely unusual hardship" were changed to merely "extreme hardship."

We recognize, as did the Eighth Circuit in *Rios-Pineda v. Immigration & Naturalization Service*, 720 F.2d 529, 530–31 (8th Cir.1983) that "recent legislative action" may render this case "moot" due to the extended period of time Ramona has been within U.S. borders. On June 20, 1984, the House of Representatives passed H.R. 1510, the Immigration Reform and Control Act of 1983, which had twice previously passed the Senate as S. 529. A "legalization" provision, one of the more hotly contested portions of the new law, would grant amnesty from deportation to many long term resident, yet "illegal" immigrants presently within our borders. *See* 129 Cong.Rec. S6905–S6987 (daily ed. May 18, 1983) (consideration and passage of S. 529, 98th Cong., 1st Sess. (1983)); 130 Cong.Rec. H6149–H6150 (daily ed. June 20, 1984) (passage of H.R. 1510, 98th Cong., 2d Sess. (1984)).

The bill, however, is not yet law, having gone from the House floor to a conference committee for negotiation of possible revisions. We, like the Eighth Circuit, therefore "have no choice but to decide this case based on an immigration policy embodied in laws passed in substance over two decades ago." *Rios-Pineda, supra,* 720 F.2d at 531. Nonetheless, we find no disagreement with the closing words of the Eighth Circuit:

> We do not question the Board's sincerity in attempting to implement the immigration policy which languishes in our federal statutes. We do require that [the present] policy be followed to the letter and in a spirit of total fairness to those persons who may be permanently exiled from our shores as a result of its implementation.

*Id.* at 534.

**5.** In considering the hardship to Ramona, it is irrelevant that the Chrismans are not—under the plain meaning approach required by *Phinpathya*—within the group of family members specified in § 1254(a)(1). *See Antoine-Dorcelli, supra,* at 21–22 & n. 2; *Barrera-Leyva v. Immigration & Naturalization Service,* 637 F.2d 640, 644 (9th Cir.1980).

**6.** We point out that the Board, while recognizing that Ramona's sister Elia may now remain in the United States, failed to consider this separation as a factor in determining extreme hardship to Ramona. Elia is the relative to whom Ramona feels closest. While the other members of the immediate family live in Mexico, Elia has been in the United States since 1969, when she and Ramona arrived together. Under *Antoine-Dorcelli* and *Santana-Figueroa*, this factor warranted a more "fact sensitive inquiry." *Antoine-Dorcelli, supra,* 703 F.2d at 22.

In addition, we find that all the other noneconomic factors that persuaded the *Santana-Figueroa* Court to remand—length of time in the United States, adaptation to American way of life, attachment to American friends and community, and contribution to American society—are present here and should have been considered.[7]

In conclusion, we reiterate that it is not our purpose here to hold that the presence of these noneconomic factors requires the Board to reverse its decision. We reverse and remand for the sole purpose of directing the Board to consider and then make appropriate findings on these factors along with the economic factors previously before it consistent with this opinion.

REVERSED and REMANDED.

---

7. We also point out that our own opinion in *Vargas-Gonzales v. Immigration & Naturalization Service*, 647 F.2d 457 (5th Cir.1981), indicates that noneconomic factors play a strong part in extreme hardship determinations. There, we remanded to the Board for reconsideration of whether the 7 year "continuous physical presence" requirement had been met. Although the Board had not previously reached the issue of extreme hardship because it held that the continuous presence requirement had not been satisfied, we observed that the petitioner had been a "resident, householder and steadily employed resident of the United States since 1967, a family man of good moral character ... whose deportation will cause hardship to his family." *Id.* at 459. We found that "the record reflect[ed] nothing to question the uncontroverted showing" that the petitioner himself, who had "a wife and home in El Paso," and had been "continuously employed by the same employer since 1969," had "fully satisfied the ... hardship eligibility requirements for suspension." *Id.* at 459, n. 4.