Daniel B. SALAMEDA and Angelita
C. Salameda, Petitioners,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 94–3185.

United States Court of Appeals,
Seventh Circuit.

Argued Aug. 1, 1995.

Decided Nov. 9, 1995.

Royal F. Berg (argued), Chicago, IL, for Petitioners.

Donald E. Keener, Department of Justice, Office of Immigration Litigation, Washington, DC, Janet Reno, U.S. Atty. Gen., Office of the United States Attorney General, Washington, DC, A.D. Moyer, Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL, James B. Burns, Office of the United States Attorney, Chicago, IL, William J. Howard, Robert Kendall, Jr., David M. McConnell, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, Pauline C. Terrelonge (argued), Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before POSNER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.

POSNER, Chief Judge.

Daniel Salameda and his wife Angelita came to the United States from the Philippines in 1982. Salameda had a student visa; his wife was admitted as the spouse of, and their two-year-old child, Lancelot, as the child of, a nonimmigrant student. The visa was for one year, and two days after it expired Salameda went to an office of the Immigration and Naturalization Service in an effort to renew it. Whether he could have renewed the visa had he sought to do so before it expired, and whether he might have been eligible for some kind of discretionary relief after missing the deadline, are issues shrouded in legal and factual uncertainty; the parties have not addressed them; nor will we. The only result of Salameda's effort to renew his visa was to precipitate deportation proceedings against him and his wife. The proceedings dragged on in the usual manner until 1991, when the Salamedas appeared at a hearing before an immigration judge at which they conceded deportability but requested suspension of deportation under section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1). The immigration judge turned down their request and the Board of Immigration Appeals affirmed.

To invoke the discretion of the Attorney General (delegated to the Board of Immigration Appeals) to suspend deportation under section 244(a)(1), the alien must prove that he has been physically present in the United States for at least seven years during which he was a person of good moral character, and—the issue here—that his deportation would "result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." It is up to the Board to decide what shall count as "extreme hardship." Judicial review is limited to making sure that the Board has considered in a rational fashion the issues tendered by the alien's application. *Palmer v. INS*, 4 F.3d 482, 486 (7th Cir. 1993).

The proceedings of the Immigration and Naturalization Service are notorious for delay, and the opinions rendered by its judicial officers, including the members of the Board of Immigration Appeals, often flunk minimum standards of adjudicative rationality. E.g., *Osmani v. INS*, 14 F.3d 13, 14 (7th Cir.1994); *Rodriguez–Barajas v. INS*, 992 F.2d 94, 97 (7th Cir.1993); *Bastanipour v. INS*, 980 F.2d 1129, 1131, 1133 (7th Cir. 1992); *Osaghae v. INS*, 942 F.2d 1160, 1163–64 (7th Cir.1991); *Watkins v. INS*, 63 F.3d 844, 849–50 (9th Cir.1995); *Osorio v. INS*, 18 F.3d 1017, 1028–30 (2d Cir.1994). The lodgment of this troubled Service in the Department of *Justice* of a nation that was built by immigrants and continues to be enriched by a flow of immigration is an irony that should not escape notice. We imagine that Congress is more to blame than the Department or even the INS itself. The agency is absurdly understaffed. In 1994, when it decided the Salamedas' appeal from the decision by the immigration judge to deport them, the Board of Immigration Appeals had an effective membership of only four—to handle the more than 14,000 appeals lodged with the Board that year.

There is no doubt that the Salamedas will experience hardship as a result of being deported to the Philippines with uncertain prospects of ever being readmitted to the United States. Besides Lancelot, now 15 years old, who has lived in the United States since he was 2, the Salamedas have a child born in the United States (hence a U.S. citizen) who is now almost 7. It is hardly to be supposed that the Salamedas would leave their children in the United States. Of course, as the INS's counsel reminded us at argument, it is the Salamedas' "fault" that their children face the prospect of deportation to an alien land. Had the Salamedas returned to the Philippines when Daniel Salameda's student visa expired, Lancelot would have been quickly reacculturated to Philippine ways and the second child would have been born and raised in the Philippines. Although the Board can if it wants give less weight to hardships that accrued during the period of illegal residence in the United States, *Garcia–Lopez v. INS*, 923 F.2d 72, 74 (7th Cir.1991); *Salas–Velazquez v. INS*, 34 F.3d 705, 709 (8th Cir.1994); *Sullivan v. INS*, 772 F.2d 609, 611 (9th Cir.1985), the only hardship that the Board (actually the immigration judge) discounted here on that ground was the Salamedas' purchase of a house. The statutory provision is available only to aliens who have resided in the United States for at least seven years, normally illegally, and these aliens cannot be expected to live in a state of suspended animation until their status is resolved; here that would have required the Salamedas to postpone conceiving a second child for thirteen years. The Board traditionally considers long residence in the United States a source of extreme hardship to the deportee. E.g., *In re Pena–Diaz*, 1994 WL 442053 (BIA Aug. 4, 1994); *In re Woo*, 10 I. & N. Dec. 347, 350 (BIA 1963) (15 years); *In re Huey*, 13 I. & N. Dec. 5, 7 (BIA 1968). And it is not as if the Salamedas had been fugitives during this period.

The remaining hardship in this case concerns the extensive round of community and charitable activities in which both adult Salamedas engage in their home town of Rockford, Illinois. One might wonder how the termination of these activities could constitute a hardship to the aliens rather than to their communities. The answer is that these activities are evidence of a high degree of integration of the aliens into the community, increasing the wrench to them of being ex-

pelled from it. *Villena v. INS,* 622 F.2d 1352, 1357 (9th Cir.1980). A number of decisions by federal courts of appeals hold (none to the contrary) that the Board, in considering whether "extreme hardship" has been shown, *must* consider the alien's "community assistance." *Turri v. INS,* 997 F.2d 1306, 1310 (10th Cir.1993); *Zamora–Garcia v. INS,* 737 F.2d 488, 495 (5th Cir.1984); *Zavala–Bonilla v. INS,* 730 F.2d 562, 568 (9th Cir.1984); *Santana–Figueroa v. INS,* 644 F.2d 1354, 1357 (9th Cir.1981). As an original matter, bearing in mind the lack of any statutory definition of extreme hardship and the deference (of which more shortly) that judges owe to administrative interpretations of open-ended regulatory statutes, we might be inclined to doubt the soundness of these decisions. Community assistance does not seem so organic to the concept of extreme hardship as to require the Board, as a matter of law, to consider it. But because the government acknowledges in its brief the Board's obligation to consider community assistance in deciding whether extreme hardship has been shown, this is hardly the right case in which to create an intercircuit conflict on the issue.

 The Board itself may have decided, in the exercise of its discretion to interpret the vague statutory term "extreme hardship," that community assistance should be considered. This would bolster the judicial interpretations that we have been discussing, but it would also have independent significance for our review of the order of deportation. An agency may not abandon an interpretation without an explanation, not here attempted. E.g., *Guillen–Garcia v. INS,* 60 F.3d 340, 342 n. 4 (7th Cir.1995); *Dashto v. INS,* 59 F.3d 697, 703 (7th Cir.1995); *Busboom Grain Co. v. ICC,* 856 F.2d 790, 796 (7th Cir.1988). Agencies do not have the same freedom as courts to change direction without acknowledging and justifying the change. E.g., *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2865–66, 77 L.Ed.2d 443 (1983); *Blankenship & Associates, Inc. v. NLRB,* 999 F.2d 248, 251 (7th Cir.1993); *Continental Web Press, Inc. v. NLRB,* 742 F.2d 1087, 1093–94 (7th Cir.1984). In *Turri v. INS, supra,* 997

F.2d at 1310, the Tenth Circuit said that the Board interprets extreme hardship to require consideration of community assistance, and although we can find only the barest hint of that position in the Board's decisions, *In re Anderson,* 16 I. & N. Dec. 596, 597 (BIA 1978); *In re Ige,* 1994 WL 520996 (BIA Sept. 16, 1994); *In re Lum,* 11 I. & N. Dec. 295, 297–98 (BIA 1965) (deportee's substantial investment in restaurant), it may be significant that in this case the immigration judge considered the factor and the Board said that he had considered all the factors that are legally relevant to a judgment of extreme hardship. The Board did not say or hint that the administrative law judge had wasted his time in considering the Salamedas' contribution to their community. In view of this we can hardly ignore what the immigration judge said or the record that was before him.

We are far from concluding that it is in fact the Board's position that community assistance is an element of extreme hardship. But in light of the holdings of the other circuits and the Board's apparent acquiescence in the immigration judge's adoption of that position and the government's acknowledgment that it is the Board's position, we think it is the law of this case that community-assistance must be considered. The government's lawyer may be wrong but we think she probably knows the Board's collective mind better than we do.

Whether the impact on the children of expulsion to the Philippines plus the termination of the Salamedas' volunteer activities sums to extreme hardship may be doubted, depending on the force of "extreme" or, what is the same issue really, the typicality of the Salamedas' plight. But that is not the issue for us. The power of the Board to uphold the deportation of people whose showing of extreme hardship is no stronger than the Salamedas' is not in question. The cases emphasize the breadth of the Board's discretion, though the most ringing statements appear in decisions involving denial of motions to reopen deportation proceedings, a different setting from the present case. E.g., *INS v. Abudu,* 485 U.S. 94, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988); *INS v. Rios–Pineda,* 471 U.S. 444, 105 S.Ct. 2098, 85 L.Ed.2d 452

(1985); *INS v. Jong Ha Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981). We accept absolutely that we are not to substitute our statutory interpretation for that of the Board in cases in which the statute is ambiguous, *id.* at 144, 101 S.Ct. at 1031, and that is why we expressed skepticism earlier as to the propriety of courts' deciding that community assistance must be considered in evaluating a claim of "extreme hardship"—unless the Board decides to do so, which, however, it may have done.

■ The issue that we decide today is not one of statutory interpretation. It is whether the INS's judicial officers addressed in a rational manner the questions that the aliens tendered for consideration. They did not. The two opinions, that of the immigration judge and that of the Board of Immigration Appeals, are incomprehensible at the critical junctures—the issue of hardship to the children and the issue of community service. With regard to the first, the immigration judge stated flatly that the statute precluded his considering the hardship to Lancelot, who neither is a citizen nor was admitted to the United States for permanent residence. Apart from the aliens themselves who are asking for suspension of deportation (Mr. and Mrs. Salameda), these are indeed the only classes of person whose hardship is to be considered. For this reason the Salamedas' lawyer asked that Lancelot be named a party to the deportation proceeding, but the INS refused. In order to economize on its limited resources, the INS usually does not bother to institute a formal deportation proceeding against an alien who is likely to depart anyway, such as the minor child of parents who are being deported. *INS Operations Instructions Manual* § 242.1a(22)(A)(1). But the only motivation we can think of for the INS's refusing to include such an alien, at the parents' request, in the pending proceeding is—since Lancelot has no greater right than his parents to remain in the United States—to prevent the hardship to him from being considered. This strikes us as an ignoble ploy. Since Lancelot will have to follow his parents into exile, having no legal right to remain in the United States, he is constructively deported and should therefore, one might suppose, be entitled to ask—or more realistically his parents' lawyer should be entitled to ask on his behalf—for suspension. The Board of Immigration Appeals did not mention Lancelot in its opinion, but since it "affirmed [this aspect of the immigration judge's opinion] in all respects," we take it that it agreed with his refusal to consider the hardship to Lancelot. For all that appears, Lancelot has no competence in any language other than English. The extent to which this or other aspects of his upbringing would impair his chances of adjusting to Philippine society is an element of potential hardship that the Immigration and Naturalization Service is not free to disregard without any explanation.

■ We are mindful that many cases say that the hardship to the deportee's noncitizen family is not to be considered. E.g., *Marquez–Medina v. INS*, 765 F.2d 673, 676 n. 4 (7th Cir.1985); *Bueno–Carrillo v. Landon*, 682 F.2d 143, 145 n. 2 (7th Cir.1982); *Carnalla–Munoz v. INS*, 627 F.2d 1004, 1006 (9th Cir.1980). This of course is what the statute says. None of the cases, however, addresses the possibility that the noncitizen family member, because a child, will in effect be deported as well and is therefore entitled to ask for relief on his own account, as it were. It would be curious if the fact that a family member was not the formal target of the deportation order had the effect of depriving him of the right to request suspension of deportation. Maybe that is how the statute ought to be read, but we think the Board has an obligation to consider this novel interpretive question, which the Salamedas are pressing and no court has considered (nor the Board), rather than ignore it, as the Board did. (There is no contention that the Salamedas waived the issue at any stage of these proceedings.) It would be premature for us to attempt to resolve it without the views of the Board. *Batanic v. INS*, 12 F.3d 662, 665 (7th Cir.1993); see also *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Rosendo–Ramirez v. INS*, 32 F.3d 1085, 1087 n. 2 (7th Cir.1994); *American–Arab Anti–Discrimination Committee v. Thornburgh*, 970 F.2d 501, 511 (9th Cir.1991). This is the

teaching of the *Jong Ha Wang* case that we cited earlier.

We do not of course suggest that Lancelot has the right of a citizen or that the Board can be ordered to institute deportation proceedings against Lancelot or admit him as a respondent in the proceeding against his parents, *Johns v. Department of Justice,* 653 F.2d 884, 893 (5th Cir.1981), which might be to his disadvantage since as a deportee he would find it harder to get back into the United States than if he merely leaves in the company of his parents without having been ordered to leave. All we are suggesting is that he may be entitled to have the hardship to him considered as if he had been a formal party to the proceeding.

■ As for community service, the Board seems to have considered this irrelevant as a matter of law. It said the Salamedas' "community service is a very positive factor with respect to the exercise of discretion but, having failed to establish statutory eligibility under section 244 of the Act, we do not reach that question." We don't get it. Community service is a factor to be considered in deciding *whether* the statutory criterion of extreme hardship has been satisfied, so the Board cannot disregard it in deciding whether the alien has shown extreme hardship and is therefore eligible for a discretionary exercise of the power to suspend deportation. By deeming community service irrelevant to deciding whether the alien has shown extreme hardship, the Board has without explanation changed the standard that its lawyer acknowledges as the position of the Board— that the Board *itself* seems to have acknowledged when it said the immigration judge had touched all the bases.

We may seem awfully picky in remanding a case in which the showing of extreme hardship is as marginal as it is here, and awfully unforgiving of the resource constraints that prevent the judicial officers of the immigration service from doing a competent job. But the government has not argued harmless error, and understaffing is not a defense to a violation of principles of administrative law admitted to bind the Immigration and Naturalization Service. (It would be pretty weird if an agency could get a reduced standard of judicial review of its decisions simply by asking Congress for a reduced appropriation!) The richest nation in the world, which happens to be a nation of immigrants, can afford to staff its immigration service. The Department of Justice has failed to offer a rational justification for its order denying the Salamedas' application for suspension of deportation, and the order must therefore be

VACATED.

EASTERBROOK, Circuit Judge, dissenting.

Congress has starved the immigration bureaucracy of funds, so the process of deportation takes unconscionably long. During the delay, in this case 13 years and counting, aliens must try to live normal lives, and the passing milestones (marriage, children, employment, religious and civic activities) create new arguments for remaining here. The longer the delay, the more people join the queue, because delay itself gives them what they principally desire—the opportunity to remain in the United States. A short-handed INS is hard pressed to keep up with the flow of new cases, let alone address the evolving circumstances in ongoing ones. It is inevitable that in the process some arguments will be dealt with in passing, or not at all, and that judges disposed to question any of the Board's decisions won't want for opportunity. But should we seek to use that opportunity?

Any adjudicatory system—even one flush with resources—must decide which cases require the greatest investment. Some cases are close, some lopsided. Courts know this and respond accordingly. We dispense with oral argument in simple cases and issue curt orders; even our published opinions make short work of (or ignore) arguments we deem legally unfounded or factually unsupported. Any approach that lavished on simple cases the resources required to decide hard ones would do a disservice to the litigants in the hard cases, who would receive less attention, without providing benefits (which is to say, more accurate decisions) for the litigants in the easy cases. See Jerry L. Mashaw, *Bureaucratic Justice* 187–90 (1983).

This is an easy case. Have the Salamedas demonstrated (it is their burden) not only that deportation would "result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence" but also that a favorable exercise of discretion is warranted? See 8 U.S.C. § 1254(a)(1). The BIA decided adversely to them on the first question and did not reach the second. What else could the Board have done?

The Salamedas do not think that they and their children will flourish in the Philippines as they do in the United States. This is "hardship." But what is "extreme" about it? Differences in economic circumstances, and the wrenching experience of moving to a different nation, are staples of immigration cases; they explain why the alien wants to stay in the United States. The Philippines are more advanced than many a country to which we deport people; 90% of the population is literate. Insurrection has abated; people are not dragooned into the military; there is no serious religious oppression; the political system is reasonably open. The Salamedas, who have advanced degrees, are more able to make a transition than most. They have children accustomed to the United States, but that is normal rather than extreme. Normal and extreme are legal antipodes. Unless the word "extreme" has lost all meaning, this is a routine case.

The BIA is entitled to be hard-nosed, to take "extreme" literally. *INS v. Jong Ha Wang,* 450 U.S. 139, 145, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981) (observing that "a narrow interpretation is consistent with the 'extreme hardship' language, which itself indicates the exceptional nature of the suspension remedy"). See also *INS v. Abudu,* 485 U.S. 94, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988); *INS v. Rios–Pineda,* 471 U.S. 444, 105 S.Ct. 2098, 85 L.Ed.2d 452 (1985); and *INS v. Phinpathya,* 464 U.S. 183, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984), among many recent immigration cases emphasizing how restricted is the judicial role. "Extreme hardship" presents an exceptionally high hurdle for the Salamedas, one they did not surmount. The Board wrote that their "hardship did not exceed that imposed on most aliens who had resided in the United States for some time." That finding is unimpeachable.

I asked: "What else could the Board have done?" The majority thinks that it could and should have discussed two legal issues: first, whether parents are entitled to have the hardship to a non-citizen child considered; second, whether an interruption by deportation of service the aliens are providing *to their community* counts as "extreme hardship" *to the aliens.* Administrative agencies must deal with the arguments presented to them—must deal with these arguments rationally, and in line with their precedents, even though not in depth. But they need deal only with arguments presented. The Salamedas did not make these arguments until arriving in this court. Here is their brief to the Board:

The Respondents both have lead exemplary lives and have a history of public service. They have one United States citizen child.

The Board's attention is directed to Section 244(b)(2) of the Immigration and Naturalization Nationality Act. The entry that the male Respondent made into the United States when he went to Canada to receive an award was clearly "innocent, casual and brief." *See Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). The Board's attention is, also, directed to *Matter of P—,* Vol. 8 INS 167. Factually, the *Matter of P—* is identical to the case at bar. Since seeing the *Matter of P—* is an interim decision, it was incumbent upon the immigration judge, only if he could distinguish the cases, to decide contrary to the Board's precedent.

The Board of Immigration Appeals has denied oral argument in most of my cases in the last three years. I would like to point out to the Board in oral argument that the record clearly reveals that the Respondents are worthy of relief sought, and it is respectfully requested that oral argument be granted.

This is the whole thing, with all errors faithfully reproduced. *In re P—,* 8 I. & N. Dec. 167 (1958), a decision by a Regional Commis-

sioner, concerns the effect of a brief trip abroad on eligibility for suspension of deportation; the Board ruled in the Salamedas' favor on this question. Counsel did not propound either of the arguments that my colleagues chastise the Board for ignoring. The brief does not mention Lancelot, does not contend that he should have been made a respondent or that hardship to him is relevant, and does not argue that the discontinuation of service to the community would be extreme hardship to the Salamedas. The Salamedas did not make these arguments to the immigration judge either. Their lawyer neither filed a trial brief nor presented an oral argument at the close of the hearing. After losing in the BIA the Salamedas engaged a new lawyer, who has served their interests better than the old, but the Salamedas are stuck with their former counsel's wretched performance. It is not possible to wag a finger at the Board for sloughing over arguments. Although it deemed the Salamedas' brief so skimpy as to render the appeal "amenable to summary dismissal", the Board did not give them the immediate heave-ho but mulled over the questions fairly presented by the record without the aid of counsel. The thanks it gets from the majority—exemplifying the maxim that no good deed goes unpunished—will dissuade the Board from showing similar kindness in the future.

One could say that the Board's lawyer has not pointed out these shortcomings, thus forfeiting any argument based on the Salamedas' forfeiture. If this were an appeal from the district court, we would enforce forfeiture rules rigorously, for in civil litigation we hold the parties to their arguments and omissions alike. But we are not reviewing the decision of a judge; we are asked to set aside the decision of a coordinate branch of the government. Considerations of comity mean that a court is not obliged to accept waivers that arise by oversights in briefing, even though it is free to do so. Cf. *Schiro v. Farley*, —— U.S. ——, ——–——, 114 S.Ct. 783, 788–89, 127 L.Ed.2d 47: *Granberry v. Greer*, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987); *Pittman v. Chicago Board of Education*, 64 F.3d 1098, 1101 (7th Cir.1995). Otherwise a junior staff attorney could overrule the Board of Immigration Appeals, even the Attorney General or President. A court may hold an attorney's forfeiture against an agency, see *Air Courier Conference v. Postal Workers Union*, 498 U.S. 517, 522–23, 111 S.Ct. 913, 916–18, 112 L.Ed.2d 1125 (1991), but need not. We should forgive the forfeiture in this case because the Salamedas have little chance on remand, as my colleagues concede at the end of their opinion, yet the proceedings may impose substantial costs on Lancelot—who may end up being deported rather than allowed to leave with his parents. Be that as it may, the reference to forfeiture in my colleagues' opinion is a sidelight. According to the majority, "[t]he issue that we decide today is ... whether the INS's judicial officers addressed in a rational manner the questions that the aliens tendered for consideration. They did not." Slip op. at 6. Given the nature of the Salamedas' administrative brief, my colleagues' characterization of "the issue" is untenable.

Should the BIA have taken upon itself the role of counsel for the Salamedas and constructed arguments that their lawyer did not? I could understand hurling a brickbat or two if the Board *had* essayed an opinion on novel issues without prompting, for its *opinion would be uninformed and could adversely affect other aliens*. Silence was the proper course. At all events, would consideration of these questions have made a difference? The Salamedas' request to have Lancelot added as a respondent is an effort to evade a limitation in the statute, which says that hardship to a child counts as an argument against the parent's deportation only if the child is a citizen of the United States or admitted for permanent residence (Lancelot is neither). We have it on the highest authority that evasions of this rule are not proper. *INS v. Hector*, 479 U.S. 85, 107 S.Ct. 379, 93 L.Ed.2d 326 (1986); *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). The Salamedas' maneuver therefore is doomed to fail. But let us suppose the immigration judge had permitted Lancelot to join the proceedings, where he could have argued that deportation would expose him to "extreme hardship." What hardship would that be? Lancelot may today

be an average Midwestern teenager, with American attitudes, and may not be fluent in either of the major languages in the Philippines (Pilipino and English). He will lose touch with his friends, and his economic opportunities may be straitened. Still, the BIA understands "extreme hardship" to mean something, well, extreme:

> it is only when other factors such as advanced age, severe illness, family ties, etc. combine with economic detriment to make deportation extremely hard on the alien or the citizen or permanent resident members of his family that Congress has authorized suspension of the deportation order.

*In re Anderson,* 16 I. & N. Dec. 596, 598 (1978). I have turned to Anderson for this quotation because it is the only administrative case cited in the Salamedas' brief, and they appear to be content with its understanding of the law. *Anderson* held that deportation to a nation poorer that the Philippines could not amount to "extreme hardship"—not just "did not" but "could not." Lancelot's claim is as ordinary as his parents', and making him a party could do nothing but produce a formal order of deportation against him, which would impede his return to this country later in life. 8 U.S.C. §§ 1182(a)(6), 1326. My colleagues think that the immigration judge acted ignobly in keeping Lancelot out of the case; I think that the judge did Lancelot a favor. Protecting minors from bad lawyers is an important task for a Department of *Justice.*

*Anderson* plays a role in the Salamedas' second legal argument, too. They cite it for the proposition that an interruption in an alien's service to the community can be "extreme hardship" to the alien. The BIA said about the Salamedas:

> As a final note, the [Salamedas'] community service is a very positive factor with respect to the exercise of discretion but, having failed to establish statutory eligibility under section 244 of the Act, we do not reach that question.

This implies, though it does not quite say, that community service is not a way to establish "extreme hardship *to the alien* or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admit-

ted for permanent residence" (the meaning of "statutory eligibility"). According to the Salamedas, this approach conflicts with *Anderson;* and, because agencies may not change stands without explanation, the Salamedas believe that the Board's decision in their case is defective. The minor premise in this syllogism is correct—agencies must stick with established norms unless they justify the adoption of new ones, see *Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade,* 412 U.S. 800, 807–08, 93 S.Ct. 2367, 2374–75, 37 L.Ed.2d 350 (1973)—but the major premise is wrong. *Anderson* did not establish a norm about community service.

An alien sought relief from deportation on the ground that his economic position would deteriorate. In an effort to persuade the Board that financial hardship could satisfy the statutory criterion, Anderson relied on a passage from a committee report in the House of Representatives. This passage mentions community service; the Board quoted from the passage; ever since, litigants have been arguing that the language of the House Report represents the Board's own position. But Anderson did not make a community-service claim, so the Board did not discuss the subject. What is more, the passage is about a bill that would have changed the legal standard from "extreme hardship" to "unusual hardship." To restore the context, I reproduce the Board's discussion:

> At oral argument, counsel for the respondent directed our attention to recent comments by the House Judiciary Committee on the issue of extreme hardship. Counsel was referring to a report by the committee in the 94th Congress on § 4 of H.R. 8713, a bill which provided for discretionary adjustment of status for certain aliens whose deportation would result in "unusual hardship". The committee report contains the following discussion:
>
> > With respect to determining hardship under section 4 of this bill the Attorney General is expected to apply similar criteria to that which is currently utilized in granting suspension of deportation and consider the following facts and circumstances among others: age of the

subject; family ties in the United States and abroad; length of residence in the United States; condition of health; conditions in the country to which the alien is returnable—economic and political; financial status—business and occupation; the possibility of other means of adjustment of status; whether of special assistance to the United States or community; immigration history; position in the community.[1]

In light of these statements, counsel contends that the impoverished economy of the Dominican Republic should be a dispositive factor in this suspension application.

Conditions in an alien's homeland are relevant in determining hardship, as the Committee pointed out. It is obvious, however, that laying critical emphasis on the economic and political situation would mandate a grant of relief in most cases for it is a demonstrable fact that despite the beleaguered state of our own economy, the United States enjoys a standard of living higher than that in most of the other countries of the world. For this reason, most deported aliens will likely suffer some degree of financial hardship. Nonetheless, we do not believe that Congress intended to remedy this situation by suspending the deportation of all those who will be unable to maintain the standard of living at home which they have managed to achieve in this country. Clearly, it is only when other factors such as advanced age, severe illness, family ties, etc. combine with economic detriment to make deportation extremely hard on the alien or the citizen or permanent resident members of his family that Congress has authorized suspension of the deportation order.

---

[1] H.R. 8713 was reported out of Committee to the full House; however, no action was taken on the measure by the House prior to the adjournment of the 94th Congress. For a discussion of the limited significance of legislative committee statements in the area of administrative discretion, see *Matter of Riccio,* Interim Decision 2463 (BIA 1976).

16 I. & N. Dec. at 597–98. The proposal to change the law failed, and with that failure the significance of the Committee Report evaporated. This report does not elucidate the statute on the books, and the Board gave it the significance that failure earned it.

No administrative opinion has held that an end of service to the community can produce extreme hardship to the alien. The BIA did not have to explain a change of position, for it has not changed positions. I therefore do not understand what the majority can mean in saying that "it is the law of this case that community assistance must be considered." Slip op. at 5. The Board said (well, strongly implied) the opposite. The immigration judge mentioned the Salamedas' community service, and the BIA said that he had considered all relevant facts, but this is distinct from saying that all facts the immigration judge mentioned are relevant to all issues; the Board said that community service is relevant only to the exercise of discretion. "The judge considered all of the relevant facts" and "all of the facts the judge considered are relevant" differ, sometimes (and here) dramatically; the Board said the former and denied the latter. Similarly, I do not follow my colleagues' assertion (slip op. at 9) that "[b]y deeming community service irrelevant to deciding whether the alien has shown extreme hardship, the Board has without explanation changed the standard that its lawyer acknowledges as the position of the Board". The Board says in Month 1 that the legal rule is X; its lawyer says in Month 10 that the rule is Y. Unless time is running backward, it is not possible to say that the agency has "without explanation changed the standard" articulated by the lawyer. Counsel must conform to the agency's view, not the other way 'round. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *American Textile Manufacturers Institute, Inc. v. Donovan,* 452 U.S. 490, 539, 101 S.Ct. 2478, 2505, 69 L.Ed.2d 185 (1981); *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). In the event of disparity it is the lawyer's views that must be discarded. No other case treats a disagreement between agency and counsel as a flaw in the agency's

decision. Anyway, the Board's appellate lawyer has not conceded that the BIA must consider community service as part of the hardship equation; the most that can be said is that the lawyer thinks that the Board may do so—and even this is no more than implicit. The brief says: "The immigration judge considered *all* legally relevant factors for the grant of suspension, including [the Salamedas'] community service, as shown by this statement ..." (emphasis in original). Such a backhanded assessment, offered without further explanation, is not a good reason to reverse an administrative order.

According to my colleagues, "[a] number of decisions by federal courts of appeals hold (none to the contrary) that the Board, in considering whether 'extreme hardship' has been shown, *must* consider the alien's 'community assistance.'" Slip op. at 4; emphasis in original. They allow that the Board might disagree with these opinions, and that "bearing in mind ... the deference ... that judges owe to administrative interpretations of open-ended regulatory statutes, we might be inclined to doubt the soundness of these decisions." *Id.* at 4–5. But because the Board did not grapple with the subject, my colleagues say, we should not create a conflict among the circuits. Pass the reason the Board did not analyze the subject—the Salamedas' failure to ask. Is it true that three courts of appeals have so held? The majority cites *Turri v. INS*, 997 F.2d 1306, 1310 (10th Cir.1993); *Zamora–Garcia v. INS*, 737 F.2d 488, 495 (5th Cir.1984); *Zavala–Bonilla v. INS*, 730 F.2d 562, 568 (9th Cir.1984); and *Santana–Figueroa v. INS*, 644 F.2d 1354, 1357 (9th Cir.1981). I do not think that any of the four opinions contains a holding on the subject. Take *Santana–Figueroa*, the first to be decided. Santana–Figueroa did not argue that he was involved in community affairs, although he did say that he went to church and had friends. The ninth circuit wrote:

> The record shows that the petitioner regularly attended church for at least ten years, had close friends here, and testified that he felt he had become part of American society. His priest wrote that he had been "an asset to our church and community." The Board should not have disre-

garded the possibility that extreme hardship would result from the combined effect of depriving the petitioner of his livelihood and uprooting him from a community to which he belonged and contributed for more than a decade.

644 F.2d at 1357. The Salamedas are not arguing that they will be deprived of their livelihood, and that being torn from their community as well will put them over the line from ordinary to "extreme" hardship. Theirs is not a combination-of-hardships argument, nor is this the way the majority interprets *Santana–Figueroa.* Or take the most recent of the cases, *Turri.* The tenth circuit wrote:

> The Board and the courts have acknowledged that an alien's business and position in, and contributions to, the community are relevant to a claim of extreme hardship.

997 F.2d at 1310. For this proposition it cited *Santana–Figueroa, Anderson,* and another administrative decision even less pertinent. To say that one or another body has "acknowledged" that Fact A is relevant to Inquiry B does not mean (as my colleagues put it) that "that the Board, in considering whether 'extreme hardship' has been shown, *must* consider the alien's 'community assistance.'" If these be holdings on this subject, they are (a) no better reasoned than the opinions of the Board that my colleagues disparage, and (b) inconsistent with the relation between court and agency in defining "extreme hardship" that the Supreme Court established in the cases I cited at the outset.

In *Jong Ha Wang* the Board ordered two well-educated aliens, and their two children, deported to Korea. The ninth circuit reversed. The Supreme Court reversed in turn, writing:

> The crucial question in this case is what constitutes "extreme hardship." These words are not self-explanatory, and reasonable men could easily differ as to their construction. But the Act commits their definition in the first instance to the Attorney General and his delegates, and their construction and application of this standard should not be overturned by a reviewing court simply because it may prefer

another interpretation of the statute. Here, the Board considered the facts alleged and found that neither respondents nor their children would suffer extreme hardship. The Board considered it well settled that a mere showing of economic detriment was insufficient to satisfy the requirements of [the statute] and in any event noted that respondents had significant financial resources while finding nothing to suggest that Mr. Wang could not find suitable employment in Korea. It also followed that respondents' two children would not suffer serious economic deprivation if they returned to Korea. Finally, the Board could not believe that the two "young children of affluent, educated parents" would be subject to such educational deprivations in Korea as to amount to extreme hardship. In making these determinations, the Board was acting within its authority. As we see it, nothing in the allegations indicated that this is a particularly unusual case. . . .

450 U.S. at 144–45, 101 S.Ct. at 1031. Factual differences between this case and *Jong Ha Wang* are few and legally irrelevant; and if the other courts of appeals *really* have held that "that the Board, in considering whether 'extreme hardship' has been shown, *must* consider the alien's 'community assistance'", then they have committed the same legal error that led to reversal in *Jong Ha Wang*. We should give our fellow judges the benefit of the doubt rather than attributing to their opaque passages a violation of instructions issued by the Supreme Court. And we must give the Board the benefit of the doubt in a case materially identical to *Jong Ha Wang* itself.

The Board could treat community service as an ingredient in the statutory hardship formula, but it has not done so—and in this case it wasn't even asked to. Deciding 14,-000 cases a year, the Board is bound to commit some howlers. Our own output of 1,800 or so decisions per year likewise contains a healthy portion of incorrect legal assertions, suppressed but questionable assumptions, and incomplete analyses. The inevitability of error in a large population of decisions does not justify reversing *this* one, however—not unless the Board must lavish

scarce time and energy on non-issues in simple cases.